Donald Specter, CA #083925
dspecter@prisonlaw.com
Corene T. Kendrick, CA #226642
ckendrick@prisonlaw.com
Margot K. Mendelson, CA #268583
mmendelson@prisonlaw.com
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, CA 94710
Phone: 510-280-2621
Fax: 510-280-2704

**[ADDITIONAL COUNSEL ON FOLLOWING PAGE]**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION – RIVERSIDE**

| | |
|---|---|
| STEPHENSON AWAH TENENG, MARCEL NGWA, ANKUSH KUMAR, GURJINDER SINGH, ATINDER PAUL SINGH, NOE MAURICIO GRANADOS AQUINO, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br> DONALD J. TRUMP, President of the United States, KIRSTJEN NIELSEN, Secretary Department of Homeland Security; RONALD D. VITIELLO, Acting Director, Immigration and Customs Enforcement; DAVID MARIN, Field Office Director, Los Angeles Field Office of Immigration and Customs Enforcement; JEFFERSON BEAUREGARD SESSIONS, III, U.S. Attorney General; HUGH J. HURWITZ, Acting Director, Federal Bureau of Prisons, DAVID SHINN, Warden, FCI Victorville Medium Security Prison I/II, in their official capacities only, <br><br> Defendants. | Case Number: <br><br> _____ <br><br> **COMPLAINT** <br><br> **CLASS ACTION** |

David C. Fathi (pro hac vice to be filed)*
dfathi@aclu.org
Daniel Mach (pro hac vice to be filed)
dmach@aclu.org
Victoria Lopez (pro hac vice to be filed)*
vlopez@aclu.org
Heather L. Weaver, CA # 226853
hweaver@aclu.org
Rekha Arulanantham*, CA #317995
rarulanantham@aclu.org
**ACLU FOUNDATION**
915 15th St. N.W., Ste.  600
Washington, DC  20005
Phone: (202) 548-6603
Fax:  (202) 393-4931

*Not admitted in DC; practice limited to federal courts

Timothy Fox, CA #157750
tfox@creeclaw.org
Elizabeth Jordan (pro hac vice to be filed)*
ejordan@creeclaw.org
**CIVIL RIGHTS EDUCATION AND
ENFORCEMENT CENTER**
104 Broadway, Suite 400
Denver, CO  80203
Phone:  303-757-7901
Fax:  303-593-3339

*Not admitted in Colorado

Attorneys for Plaintiffs, on *behalf of
themselves and others similarly situated*

**INTRODUCTION**

1.      Shackled at the ankles and wrists, men in orange and brown prison jumpsuits shuffle from prison buildings to buses, surrounded by chained link fences and barbed wire in the hot California desert.  Inside the prison, they are confused, despondent, and hungry.  They are locked in prison cells for much of the day and all night.  No health care provider has assessed them, asked if they are suicidal, or attempted to help them cope with the underlying trauma that drove many of them to seek asylum in this country.  In the chow hall, they are offered inadequate and, at times, inedible food, such as spoiled milk and sandwiches that consist of just two slices of bread.  Uniformed corrections officers rush the men out of the chow hall only minutes after food is served.

2.      Outdoor exercise is limited to only a few hours of fresh air and sunlight each week.  Correctional officers bark orders in English, occasionally in Spanish, even though many of the men speak only French, Punjabi, Mam, or other languages.  As if these conditions were not appalling enough, Defendants have stripped from the imprisoned men one of the few things that might bring them some sense of comfort or peace of mind—the ability to freely practice their faith.  Defendants fail to provide religious services or consultation with clergy, and they prohibit detainees from engaging in group prayer and congregate worship.  They deny detainees halal or kosher meals that comport with their religious needs, forcing many to go hungry.  Upon the detainees' detention by the Defendants, Defendants confiscate all religious head covers, jewelry, and other articles of faith, and the detainees are unable to obtain replacements for the items.

3.      These conditions, all well documented at the Federal Correctional Institution Medium II ("Victorville"), are constitutionally impermissible when applied to individuals convicted of crimes and sentenced under our nation's criminal laws.  But this lawsuit is not about such individuals.  Rather, it is

1

about immigrants and refugees who have come to the United States seeking relief, but have been detained by the Department of Homeland Security Immigration and Customs Enforcement.  Many of these men—refugees from El Salvador, Honduras, India, Cameroon, and other troubled regions—risked their lives and those of their families by traveling across continents to avail themselves of our nation's asylum and immigration laws.  All of them seek a legal remedy under our nation's immigration laws.

4.      Since June 8, 2018, Defendants have imprisoned more than 1,000 civil immigration detainees, in violation of their constitutional rights, at Victorville.  On that date, with very little notice to the Bureau of Prisons ("BOP") and its staff, the Immigration and Customs Enforcement agency ("ICE") of the Department of Homeland Security ("DHS") transferred these men to Victorville, subjecting them to harsh prison conditions that can only reasonably be described as punitive and inhumane.

5.      Immigration detention is a form civil confinement.  The law prohibits the government from subjecting this population to punitive incarceration.  Moreover, ICE itself has recognized that there are "important distinctions between the characteristics of the Immigration Detention population in ICE custody and the administrative purpose of their detention—which is to hold, process, and prepare individuals for removal [or, as here, to ensure their appearance at future immigration and/or asylum proceedings]—as compared to *the punitive purpose of the Criminal Incarceration system*."[1]  As that same report noted, "[t]he demeanor of the Immigration Detention population is distinct from the Criminal Incarceration population.  The majority of the population [detained by ICE] is motivated by the desire for repatriation

_____

[1] Dora Schriro, Immigration Detention Overview and Recommendations at 2 (Oct.  6, 2009), https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf (emphasis added).

or relief, and [they] exercise exceptional restraint." *Id.* at 21.  Nonetheless, the ICE detainees at Victorville are being held at a medium-security federal prison and subjected to policies and practices designed for persons who have been convicted of crimes.  As a result of the unconstitutional treatment of these civil detainees, many have expressed a desire to be returned, immediately, to their countries of origin—foregoing their claims for immigration relief altogether—because they would rather face the dangers back home than be imprisoned in these abysmal conditions.

6.     Under clearly established law, these men are deprived of their rights to due process of law, which the Fifth Amendment to the U.S. Constitution guarantees to all persons who are present on our soil, regardless of citizenship.  Plaintiffs and the other detainees are also denied their constitutional rights guaranteed by the Free Exercise Clause of the First Amendment to the U.S. Constitution, as well as their statutory rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*  This lawsuit, brought by six class representatives on behalf of all civil immigration detainees who currently are or in the future will be imprisoned at Victorville, respectfully asks this Court to immediately end these terrible injustices.

7.     Specifically, Plaintiffs ask the Court to enter an order directing the Defendants, under a strict deadline, to move all ICE immigration detainees from Victorville as quickly as possible.  In addition, during the brief period that such plans are being implemented, the Court should order the Defendants immediately to provide Plaintiffs, and the classes they seek to represent, adequate health care, nutrition, out-of-cell time, programming, reading materials, religious diets, religious clothing and jewelry, religious texts, opportunities for prayer and group worship, and other accommodations necessary to practice their religious beliefs.

8. Defendants' actions have inflicted, and continue to inflict, needless harm and suffering on Plaintiffs. In addition to other constitutional violations, Defendants systematically and knowingly: (1) fail to provide minimally adequate health care; (2) fail to provide adequate nutrition; (3) inhibit detainees' free exercise of religion by (i) refusing to provide religious services or other adequate opportunities for group prayer, congregate worship, or consultation with clergy, (ii) ignoring religious dietary needs, (iii) severely impeding the possession and wearing of religious headwear, jewelry, and other religious items, (iv) denying access to religious texts, and (v) otherwise restricting detainees' ability to practice their religious beliefs; and (4) confine detainees under conditions that are unnecessarily restrictive and punitive in nature.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and 5 U.S.C. § 702.

10. Venue lies in the Central District of California under 28 U.S.C. § 1391 because at least one federal Defendant resides in this District, Plaintiffs are detained in this District, and a substantial part of the events giving rise to the claims in this action took place in this District.

## PARTIES

11. Plaintiff Stephenson Awah Teneng is a civil detainee currently incarcerated at Victorville under the authority of DHS and ICE.

12. Mr. Teneng is an asylum seeker who has been detained at Victorville since June 8, 2018. He has suffered from weeks of unaddressed dental pain, has been unable to access medication or have an appointment with a dentist, and has been unnecessarily and punitively subject to harsh conditions, including being denied food and locked in his prison cell for hours at a time in retaliation for requesting medical care.

4

13.     Plaintiff Marcel Ngwa is a civil detainee currently incarcerated at Victorville under the authority of DHS and ICE.

14.     Mr. Ngwa is an asylum seeker who has been detained at Victorville since June 8, 2018.  He suffers from back pain that has not been treated.  Due to his imprisonment at Victorville, he has suffered from depression that has not been treated.  He has been told that only BOP prisoners at Victorville, not ICE detainees, can take classes and buy the majority of products in the commissary.  Mr. Ngwa is a Presbyterian whose sincere religious beliefs counsel him to attend church and seek out consultation with clergy, when needed.  During his imprisonment at Victorville, he has been denied access to church services and has not been able to see any clergy.

15.     Plaintiff Ankush Kumar is a civil detainee currently incarcerated at Victorville under the authority of DHS and ICE.

16.     Mr. Kumar is an asylum seeker has been detained at Victorville since July 16, 2018.  Mr. Kumar has a history of kidney stones and has not received adequate medical care while imprisoned in Victorville.  After experiencing excruciating pain, his request for emergency medical attention went unmet for hours, until finally he was shackled and taken to a hospital.  He has been met with repeated delays in refilling the medication he was prescribed at the hospital.

17.     Plaintiff Gurjinder Singh is a civil detainee currently incarcerated at Victorville under the authority of DHS and ICE.

18.     Mr. Gurjinder Singh is an asylum seeker who has been detained at Victorville since July 16, 2018.  As a practicing Sikh, Mr. Singh's sincere religious beliefs dictate that his diet must be vegetarian and that he wear and keep with him Sikh religious articles of faith, including a turban and kara (a religious bracelet).  During his imprisonment at Victorville, Mr. Singh has been

5

denied an adequate vegetarian diet that comports with his Sikh beliefs.  His turban and kara were confiscated by Defendants and not returned or replaced.

19.     Plaintiff Atinder Paul Singh is a civil detainee currently incarcerated at Victorville under the authority of DHS and ICE.

20.     Mr. Atinder Paul Singh is an asylum seeker who has been detained at Victorville since June 12, 2018.  For the first two weeks he was incarcerated at Victorville, he wore the same prison uniform without access to clean clothes or laundry.  As an adherent of the Sikh faith, Mr. Singh's sincere religious beliefs require him to wear a turban and kara, as well as to follow a vegetarian diet.  During his imprisonment, Mr. Singh's articles of faith were confiscated by Defendants and not returned or replaced, and he has been denied an adequate vegetarian diet.  As a result, he has lost about 15 pounds since he was taken into ICE custody.

21.     Plaintiff Noe Mauricio Granados Aquino is a civil detainee currently incarcerated at Victorville under the authority of DHS and ICE.

22.     Mr. Granados Aquino is an asylum seeker who has been detained at Victorville since approximately July 20, 2018.  He suffers from depression, which has been exacerbated by the isolation he experiences at Victorville.  Mr. Granados Aquino is a Christian whose sincere religious beliefs counsel him to attend church and read the Bible.  During his imprisonment at Victorville, he has been denied access to congregate prayer.  Mr. Granados Aquino had a Bible in his backpack when he crossed the border, but Defendants confiscated it, and he has not been able to access a Bible at Victorville.

23.     Defendant Donald J. Trump is the President of the United States. He is ultimately responsible for the immigration policies as set out and executed by DHS and BOP.  He is responsible for the so-called "zero tolerance" immigration policy that has prompted the unconstitutional

imprisonment of civil immigration detainees.  He is named in his official capacity.

24.     Kirstjen Nielsen is the Secretary of DHS, an agency of the United States.  Secretary Nielsen is ultimately responsible for the actions of ICE.  She is the legal custodian of immigration detainees incarcerated at the Victorville prison.  She is named in her official capacity.

25.     Defendant Ronald D. Vitiello is the Acting Director of ICE, a component of DHS.  ICE is responsible for apprehension, detention, and removal of noncitizens from the United States.  He is the legal custodian of immigration detainees incarcerated at the Victorville prison.  Director Vitiello is named in his official capacity.

26.     Defendant David Marin is the Field Office Director for the Los Angeles Field Office of ICE.  Director Marin is responsible for the enforcement of the immigration laws within this district, and for ensuring that ICE officials follow the agency's policies and procedures.  He is the legal custodian of immigration detainees incarcerated at the Victorville prison.  He is named in his official capacity.

27.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and the most senior official in the U.S. Department of Justice (DOJ).  The Attorney General is ultimately responsible for the actions of the BOP and for the nation's enforcement of its immigration and asylum laws.  Mr. Sessions has implemented the so-called "zero tolerance" immigration policy of the current presidential administration that has prompted the unconstitutional imprisonment of civil immigration detainees.  He is named in his official capacity.

28.     Defendant Hugh J. Hurwitz is the Acting Director of BOP.  He is responsible for the actions, policies and practices of BOP and for the operation of Victorville.  He is named in his official capacity.

29.     Defendant David Shinn is the Warden of Victorville prison in Victorville, California.  He is the custodian of civil immigration detainees incarcerated at the Victorville prison.  He is named in his official capacity.

## I.     FACTUAL ALLEGATIONS

**A.     <u>Victorville is a Medium Security Federal Prison Meant to Imprison Persons Who Have Been Convicted of Crimes, Not Civil Immigration Detainees.</u>**

30.     Victorville is a medium security prison operated by BOP.

31.     Victorville was built on the site of a former U.S. Air Force waste site for radioactive materials, and was declared a Superfund site by the Environmental Protection Agency.  According to published reports, the water supply for the prison at Victorville contains toxic materials.[2]

32.     Victorville has been recognized as being among the most dangerous places for convicted persons in the BOP's system of medium security prisons.

33.     Hiring freezes imposed by the federal government have led to severe understaffing at BOP prisons throughout the country, including Victorville.  Victorville was so critically understaffed that BOP closed down nine housing units in early 2018 because it could not safely operate with such limited staff.

34.     As has been widely reported, the present presidential administration announced a "zero tolerance" policy toward immigrants that has employed a series of cruel and inhumane tactics—separating families, denying parole,[3] widespread detention of immigrants, including the elderly and long-

---

[2] Michael Waters, *How Prisons Are Poisoning Their Inmates*, The Outline (July 23, 2018, 10:40 AM), https://theoutline.com/post/5410/toxic-prisons-fayette-tacoma-contaminated?zd=1&zi=eeblichf.

[3] Spencer S. Hsu, *U.S.  Judge Blocks Trump Crackdown on Asylum Seekers, Bars Blanket Detentions of Those With Persecution Claims*, Wash.  Post (July 2, 2018) https://www.washingtonpost.com/local/public-safety/us-judge-blocks-trump-crackdown-on-asylum-seekers-bars-blanket-detentions-of-those-with-

8

time U.S. residents, blocking asylum seekers from ports of entry,[4] and prosecuting immigrants crossing the border—all with the stated objective to "deter" those fleeing oppressive and life-threatening conditions.

35.     As a result of these practices, the administration has manufactured a "crisis" of insufficient bed space to detain immigrants.  ICE announced, in early June, that it would begin transferring 1,600 detainees to five federal prisons in early June 2018, one of which is Victorville.

36.     On June 8, 2018, ICE suddenly began transferring hundreds of immigration detainees to Victorville.  On June 11, 2018, BOP and ICE entered into a formal Inter-Agency Agreement that has a term of one year, concluding on June 8, 2019.

37.     When the ICE detainees arrived at Victorville, BOP reopened the housing units it had previously closed, but failed to hire sufficient additional staff to address chronic understaffing at the prison and to accommodate the influx of new detainees.  On information and belief, teachers and other civilian staff at the prison have been reassigned to serve as corrections officers due to the dire shortages.[5]

---

persecution-claims/2018/07/02/cdc707ba-7e36-11e8-b660-4d0f9f0351f1_story.html?noredirect=on&utm_term=.8893f444427e; Lydia Wheeler, *Judge Rules DHS Must Give Asylum Seekers Individualized Parole Hearings,* The Hill (July 2, 2018) http://thehill.com/regulation/395254-judge-rules-dhs-must-give-asylum-seekers-individualized-parole-hearings.

[4] Robert Moore, *At The U.S.  Border, Asylum Seekers Fleeing Violence Are Told To Come Back Later*, Wash.  Post, June 8, 2018 ("They have told those who cross the border illegally and make asylum requests that they will face criminal prosecution, but that if they go through the official border crossings, their applications will be processed.  Yet in several cities along the border, asylum seekers who follow those instructions are turned away and told to return later.  At some crossings, applicants camp out for days."); Aaron Montes, *Try Later: It's Getting Tougher for Migrants to Claim Asylum at U.S. Ports of Entry*, NBC News (June 23, 2018, 5:00 AM)https://www.nbcnews.com/storyline/immigration-border-crisis/try-later-it-s-getting-tougher-migrants-claim-asylum-u-n885861 (reporting that "Customs and border protection agents now wait at the port of entry, checking identification and *preventing asylum seekers from stepping into the U.S.*").

[5] Lauren Gill, *As Immigrant Detainees Are Moved to Prisons, What Happens to the Prisoners?*, Rolling Stone, July 3, 2018.

9

38.     Prior to June 2018, Victorville housed only criminally convicted persons.  On information and belief, the prison has housed well over 1,000 civil immigration detainees since June.  Some have been detained at Victorville for nearly two months.

39.     According to the BOP corrections officers' union, the officers and staff employed at Victorville are trained under BOP standards and have not received training under ICE standards.[6]

40.     Upon their arrival at Victorville, ICE detainees are given Victorville's BOP Inmate Handbook.  On information and belief, the Handbook is available only in English and Spanish.

41.     BOP Policy states that ICE detainees in BOP facilities are to be treated as criminal pre-trial detainees.

42.     Victorville has always operated, and continues to operate, as a prison that incarcerates people who have been convicted of crimes.

**B.     Plaintiffs and Putative Class Members are Denied Minimally Adequate Health Care**

43.     By policy and practice, Defendants fail to provide minimally adequate health care to Plaintiffs and other detainees.  Detainees receive minimal or no medical, dental, or mental health screenings upon their arrival at Victorville.  *See* Ex. 10, E. Berrios Banegas Dec. at ¶ 12 (no dental screening despite painful toothache); Ex. 15, J. Rodriguez Rivera Dec. at ¶ 5 (no medical, dental, or mental health screening upon arrival).  The lack of screening is especially dangerous in light of the confirmed outbreaks of chicken pox and

---

[6] Samantha Michaels, *Understaffed Federal Prison Is Taking in 1,000 Noncriminal Immigrants, and Even the Guards Are Protesting*, Mother Jones (June 15, 2018) ("Mother Jones Article"), https://www.motherjones.com/crime-justice/2018/06/understaffed-federal-prison-is-taking-in-1000-noncriminal-immigrants-and-even-the-guards-are-protesting/.

scabies among the detained population.[7]  Medical staff provide little information to detainees about the nature of the screenings they are conducting. *See* Ex. 6, N. Granados Aquino Dec. at ¶ 15 ("They didn't tell us what was in the injection"); Ex. 2, M. Ngwa Dec. at ¶ 13 (screening was merely an injection of unknown contents).

44.    Those detainees who have received any sort of health screening generally have been forced to communicate with medical personnel who speak only English, without the benefit of a translator, even when the detainee does not speak English.  *See* Ex. 17, P. Jaimez Bueno Dec. at ¶ 8 (received medical treatment he did not understand; all services rendered in English).  Prison medical staff inappropriately rely on detainees who speak English to serve as translators for other detainees, even for sensitive medical encounters, in violation of state and federal health privacy laws.  Plaintiff Antush Kumar saw a nurse regarding his kidney stones with the assistance of a fellow Punjabi detainee who is fluent in English and has been compelled to translate for all Punjabi speakers in medical encounters.  Ex. 3, A. Kumar Dec. at ¶ 6.  Plaintiff Ngwa is fluent in English, and acts as a translator for French speaking detainees.  Ex. 2, M. Ngwa Dec. at ¶ 16.; *see also* Ex. 7, A. Thea Dec. at ¶ 4 (relies on cellmate to translate to French); Ex. 9, M. Escoto Cortez Dec. ¶ 16 (another detainee translated when he saw nurse regarding stomach pain).

45.    Mental health screening is also inadequate.  Victorville medical staff rely on a short, written survey as the only means of mental health screening.  Plaintiff Aquino has "never been asked about [his] mental health in person" since arriving at Victorville."  Ex. 6, N. Granados Aquino Dec. at ¶ 15.

---

[7] Roxana Kopetman, *Immigration detainees in Victorville prison get more scabies, chicken pox; protesters to gather Saturday*, The Orange County Register (June 29, 2018), https://www.ocregister.com/2018/06/29/immigration-inmates-in-victorville-get-more-scabies-chicken-pox-protesters-to-gather-saturday/.

When he first arrived at the prison, Mr. Granados Aquino filled out a form, on which he indicated that he was depressed. *Id.* at ¶ 16. No one ever followed up to conduct an assessment or offer him mental health services. *Id. See also* Ex. 19, W. Velasquez Ramirez Dec. at ¶ 6 (describing questionnaire used in lieu of mental health screening). The detainees are required to fill this screening form out on their own, and on information and belief, it is available only in English and Spanish. The lack of an adequate mental health screening process subjects detainees to a substantial risk of needless suffering and harm.

46.    There is inadequate health care staff to meet the needs of the civil detainees imprisoned at Victorville, resulting in all detainees being at a significant risk of serious harm. *See* n.5, *supra* (reporting on medical staff shortage).

47.    The sick call process at Victorville is inadequate, resulting in a significant risk of serious harm. There is no clear process for civil detainees imprisoned at Victorville to request medical attention other than an emergency button in their cells. Plaintiff Ngwa has not seen any form to request an appointment with medical staff. *See* Ex. 2, M. Ngwa Dec. at ¶ 11–12; Ex. 9, M. Escoto Cortez Dec. at ¶ 15 (there are no forms to fill out to see medical staff); Ex. 10, E. Berrios Benegas Dec. ¶ 11 (same); Ex. 11, R. Padilla Flores Dec. ¶ 6 (same).

48.    Moreover, detainees who try to seek medical help are often punished by being locked in their cells. Plaintiff Teneng reports that he was locked in his cell for several hours while other detainees were allowed out in response to his asking medical staff to care for his tooth pain. Ex. 1, S. Teneng Dec. at ¶¶ 13-18. As a result, other detainees have been dissuaded from requesting medical care for their own needs, having witnessed the isolation and punishment of those who have spoken up. *See* Ex. 13, R. Kumar Dec. at ¶ 3

(describing his fear of seeking medical care because of possible punishment and isolation).

49.     Defendants deny civil detainees access to emergency health care. Detainees who have pushed the emergency button in their cells have been denied care.  For example, Plaintiff Kumar pushed the button in his cell to report excruciating pain from a kidney stone.  In response, an officer told him to wait until the next day, and in the meantime, to soak a towel in hot water and put it over his abdomen.  *See* Ex. 3, A. Kumar Dec. at ¶ 5.  Another detainee, Oscar Colindres Velasquez, witnessed a corrections officer deny medical attention to a young man who pushed the emergency button when the young man's nose was bleeding.  Mr. Colindres Velasquez witnessed the corrections officer yell at the man to "deal with it and cut out your bullshit."  *See* Ex. 8, O. Colindres Velasquez Dec. at ¶ 13.  A corrections officers told detainee Jexon Rodriguez Rivera that he "should not touch the call button in [his] cell unless [he is] dying."  Ex. 15, J. Rodriguez Rivera Dec. at ¶ 24.  Roger Padilla Flores suffers from gastritis, and after he pushed the emergency button in his cell, the officer told him to wait until "mañana" for treatment, and subsequently an officer told him "don't be a dumbass" and instructed him never to push the button again.  Ex. 11, R. Padilla Flores Dec. at ¶¶ 7-8.

50.     Detainees do not have access to necessary medications.  Detainees who have attempted to relate their medical problems to the BOP staff that disburse prescriptions or to corrections officers at Victorville have been denied those necessary medications.  For example, after experiencing excruciating pain consistent with his history of kidney stones, Plaintiff Ankush Kumar waited 18 hours to receive emergency medical attention, when he was finally taken to the hospital while shackled.  *See* Ex. 3, A. Kumar Dec. at ¶¶ 5-7.  He was not given any medication prior to his emergency, despite his history of

taking medication in his home country, and has experienced delays getting his pain medication refilled since returning to Victorville from the hospital.

51.     Another detainee, Jexon Rodriguez Rivera, suffers from chronic asthma, which he informed staff upon arrival at Victorville.  *See* Ex. 15, J. Rodriguez Rivera Dec. at ¶¶ 3, 5.  Mr. Rodriguez Rivera did not receive an inhaler or other asthma medicine upon arrival or after informing staff of his condition.  *Id.*  One week after arriving at Victorville, Mr. Rodriguez Rivera suffered an asthma attack.  *Id. at* ¶ 6.  He told corrections officers but they did nothing.  *Id.*  The following day or soon thereafter, he was given an inhaler.  *Id. at* ¶ 7.  The inhaler had only 15 doses left, which ran out about one week later. *Id.*  Mr. Rodriguez Rivera requested a new inhaler but did not receive one.  *Id. at* ¶ 8.  Fear of another asthma attack without an inhaler confined Mr. Rodriguez Rivera to his cell the majority of the time while he was detained at Victorville.  *Id. at* ¶ 9.

52.     As another example, Dervi Garcia Perez was badly injured after being thrown from a truck during his journey to the U.S. border.  *See* Ex. 20, D. Garcia Perez Dec. at ¶ 2.  While in Border Patrol custody, he was taken to a hospital, where he was given pain medication.  *Id.*  He has not received any pain medication since his arrival at Victorville.  *Id. at* ¶ 4.  Mr. Garcia Perez has been unable to refill medication for his gastritis since arriving in Victorville.  *Id. at* ¶ 8.  He has no information on the process for requesting more medication or a doctor's appointment.  *Id. at* ¶ 9.  Similarly, Mr. Thea suffers from such severe gastritis that it keeps him awake at night and causes him to feel at times that he cannot breathe.  Ex. 7, A. Thea Dec. at ¶¶ 7-8. Despite multiple requests for medical attention, Mr. Thea has received no treatment for or medical assessment of his stomach condition.  *Id. at* ¶¶ 7-12.

53.     Marlon Escoto Cortez, after suffering days of stomach pain, finally saw a nurse, who only took his blood pressure, felt his stomach, and

14

joked that perhaps he was pregnant.  The nurse did not refer him to a physician.
Neither the nurse nor any other medical staff took any labs, ran any tests, or
made any diagnosis of Mr. Escoto Cortez's source of pain.  *See* Ex. 9, M.
Escoto Cortez Dec. ¶¶ 15-16.

54.     Many other detainees have experienced similar instances of
having their known medical conditions and needs ignored.  For example,
Plaintiff Teneng reports that he complained for nearly a week about a
toothache without receiving any medical treatment.  Instead, he was locked in
his cell and threatened with pepper spray if he continued to complain.  Ex. 1, S.
Teneng Dec. at ¶ 17.  *See also* Ex. 2, M. Ngwa Dec. at ¶ 13 (Plaintiff reporting
that medical staff screening for chicken pox "did not want to talk to me about
my pain"); Ex. 19, W. Velasquez Ramirez at ¶¶ 7–9 (complained of fever,
cough, and sore throat which persisted for five days, but was told that there
"weren't any medical consultations unless it was really serious, so [he] could
not have any help").

55.     Detainees have minimal or no access to mental health services.
For example, Plaintiff Aquino has received no mental health assessment or
services despite expressly indicating upon his arrival to the prison that he was
experiencing depression.  Ex. 6, N. Granados Aquino Dec. at ¶¶ 15-16.  At one
point, Mr. Granados Aquino told an officer in his housing unit that he felt sad
and depressed; the officer responded, "I can't help you right now.  Maybe
tomorrow." *Id. at* ¶11.  No one followed up on Mr. Granados Aquino's request
for help.

56.     Many detainees have suffered severe trauma in their home
countries or on their journey to the United States, and require mental health
treatment as a result.  Mr. Rodriguez Rivera reported hearing "men crying in
their beds" at night and observing men in his housing unit "with scars from
cutting themselves due to depression and desperation."  Ex. 15, J. Rodriguez

Rivera Dec. at ¶¶ 17, 18.  Mr. Colindres Velasquez also witnessed a different young man who had cut himself across his arms and wrists with the blade from his razor.  Ex. 8, O. Colindres Velasquez Dec. at ¶ 14.  Prison staff at Victorville did not remove the young man to receive mental health care or medical attention for three days.  *Id.*

57.     The punitive and degrading conditions of confinement exacerbate detainees' mental health needs.  Plaintiff Ngwa feels depressed and sad, but no health care staff at the prison has asked him whether he is depressed or suicidal.  Ex. 2, M. Ngwa Dec. at ¶¶ 10, 15.  Plaintiff Aquino cries "every time [he is] locked back up" in his cell because he feels "so alone."  Ex. 6, N. Granados Aquino Dec. at ¶ 11.  With nothing to do, Mr. Granados Aquino finds himself ruminating on "my mom, who didn't know where I was, and my loved ones, who I traveled with and who had been separated from me at the border, and about the horrible things that happened to us that caused us to come to the U.S."  *Id. at* 14.

58.     Similarly, Mr. Rodriguez Rivera said he needed to talk to a mental health professional due to his mounting depression and difficulty coping with the extreme isolation and idleness at the prison, but did not know whom he should contact or how to get help.  Ex. 15, J. Rodriguez Rivera Dec. at ¶¶ 16, 25.  Mr. Diallo reported that while he is locked in his cell with nothing to do but worry about his family, "my thoughts race and I have difficulty sleeping. My eyes have gotten red because I don't really sleep."  Ex. 18, O. Diallo Dec. at ¶ 3.  Mr. Diallo has not received "any counseling or support for [his] anxiety."  *Id.* at ¶ 7; *see also* Ex. 17, P. Jaimez Bueno Dec. at ¶ 16 ("I spent much of my time being anxious and worrying about the safety of my family numbers.  As a result, I have not slept at all in the past three nights.")

59.     In lieu of a meaningful assessment, detainees are given a written form to fill out regarding their mental health.  *See* Ex. 19, W. Velasquez

Ramirez Dec. at ¶ 6; Ex. 6, N. Granados Aquino Dec. at ¶ 15.  The form is only available in English and Spanish.  Upon information and belief, this is BOP Standard P5310.017,[8] which is used for screenings of all criminal pre-trial inmates in BOP custody.

60.     Defendants' conduct vis-à-vis the Plaintiffs and the other detainees does not comply with either ICE or the BOP's written policies.

**C.     Plaintiffs Are Denied Adequate Nutrition**

61.     Defendants routinely and systematically deny Plaintiffs and other detainees adequate nutrition and adequate time to eat even the substandard food they are provided.

62.     Upon their arrival at Victorville, Plaintiffs and other detainees were on lockdown for two or three days and received all of their meals in their cells.  These meals were insufficient and regularly consisted of a sandwich and nothing else.  The sandwiches the Plaintiffs were provided were sometimes frozen in the middle.  Upon their initial arrival, detainees who are vegetarians for religious reasons were given meals with meat in them, with no alternatives. Ex. 5, G. Singh Dec. ¶ 7.

63.     When not on lockdown, the civil detainees imprisoned at Victorville receive their meals in the chow hall.  These meals are small, inadequate, and of poor nutritional value, and frequently do not contain meat or any other sufficient source of protein.  *See* Ex. 15, J. Rodriguez Rivera Dec. at ¶ 21 ("Some days we receive sandwiches with nothing in them—just two pieces of bread."); *see also* Ex. 10, E. Berrios Banegas Dec. at ¶ 8 (complaining of inadequate food and being hungry an hour and a half after dinner); Ex. 8, O. Colindres Velasquez Dec. at ¶ 15 (complaining of inadequate food).  Detainees who are vegetarians for religious reasons, like Plaintiff G.

---

[8] BOP Standard P5310.017, Psychology Services Manual, p. 14, https://www.bop.gov/policy/progstat/5310_017.pdf.

Singh, are often offered nothing but two pieces of bread for lunch, and green beans and rice for dinner. *See* Ex. 5, G. Singh Dec. ¶ 8.

64.     Plaintiffs and other detainees imprisoned at Victorville have lost weight due to inadequate food. Plaintiff Atinder Paul Singh reports that since he arrived in mid-June, he has lost approximately 15 pounds due to the inadequate amount of food, especially for detainees who adhere to a vegetarian diet for religious reasons. Ex. 4, A.P. Singh Dec. ¶ 11. *See also* Ex. 8, O. Colindres Velasquez Dec. at ¶ 15 (10 to 15 pounds lost; "you can see the bones sticking out of my wrists that you couldn't see before"); Ex. 11, R. Padilla Flores Dec. at ¶ 5 (10 pounds of weight loss); Ex. 10, E. Berrios Banegas Dec. at ¶ 8 (5 to 10 pounds lost); Ex. 15, J. Rodriguez Rivera Dec. at ¶ 22.

65.     Defendants sometimes serve Plaintiffs food that is inedible. *See* Ex. 9, M. Escoto Cortez Dec. at ¶ 10 ("I have seen what looks like worms or maggots in the meat;" complaining of stomach problems and blood in his stool since arriving at Victorville); Ex. 8, O. Colindres Velasquez Dec. at ¶ 17 (milk is "often sour and you can't drink it or you will get sick"); Ex. 15, J. Rodriguez Rivera Dec. at ¶ 21 ("Many mornings, we receive spoiled milk at breakfast."); Ex. 10, E. Berrios Banegas Dec. at ¶ 8 ("Sometimes the meat tastes expired.").

66.     Defendants allow Plaintiffs and other detainees only minutes to eat each meal, and throw away any uneaten food. Plaintiff Aquino reports that minutes after sitting down in the chow hall, guards yell at the detainees that they have "only two minutes left" to eat. Ex. 6, N. Granados Aquino Dec. at ¶ 20. Mr. Thea reports that detainees are permitted to remain in the chow hall for no more than five minutes at meal times. Ex. 7, A. Thea Dec. at ¶ 5. *See also* Ex. 17, P. Jaimez Bueno Dec. at ¶ 12 (detainees are given three or four minutes to eat, after which uneaten food is confiscated and thrown away); Ex. 8, O. Colindres Velasquez Dec. at ¶ 15 (detainees are given approximately

five minutes before corrections officers start rushing them out); Ex. 10, E. Berrios Banegas Dec. at ¶ 8 ("We are only given 3 to 5 minutes to eat.").

67.     Detainees are not permitted to take any uneaten food out of the chow hall. *See* Ex. 6, N. Granados Aquino Dec. at ¶ 21 ("I saw an official force another detainee to throw away a piece of bread he had put in his pocket when we were leaving the chow hall . . ."); Ex. 8, O. Colindres Velasquez Dec. at ¶ 15 (detainees are not permitted to take even an apple from the chow hall).

68.     Until very recently, Plaintiffs and other detainees were denied access to commissary to supplement their meals, so they had no access to food between dinner and the next day's breakfast. The detainees are not permitted to purchase all of the food products available in the commissary. For example, Plaintiff Ngwa was told that only prisoners could purchase certain food items. Many detainees are indigent and so cannot buy food from the commissary.

69.     Defendants' conduct vis-à-vis the Plaintiffs and the other detainees does not comply with either ICE or the BOP's written policies.

**D.    Plaintiffs and Members of the Putative Subclass Are Denied the Right to Freely Exercise their Religious Beliefs**

70.     Plaintiffs Atinder Paul Singh and Gurjander Singh are adherents of the Sikh faith. Plaintiff Marcel Ngwa is a Presbyterian. Plaintiff Noe Mauricio Granados Aquino is a Christian. These Plaintiffs and other religious detainees, who include Muslims, Catholics, and Hindus, are unable to freely practice their religious beliefs due to restrictions imposed by Defendants, as well as by Defendants' failure to accommodate their religious beliefs.

71.     Defendants have refused to provide, or make available, any religious services to Plaintiffs or the other detainees of faith at Victorville, and they have refused to provide other adequate opportunities for detainees to engage in congregate worship or group prayer. By policy, detainees are restricted to their cells to practice religious activities. For example, Plaintiff

Aquino, a Christian, reports that a correctional officer denied detainees' requests to meet as a group to pray, sing, and preach.  Ex. 6, N. Granados Aquino Dec. at ¶ 23.  Similarly, Mr. Ngwa reports that there are no church services for detainees.  Ex. 2, M. Ngwa Dec. at ¶ 9.  Vakil Singh, a Hindu, reports the same regarding Hindu religious services.  Ex. 14, V. Singh Dec. at ¶ 12.  Sarvejeet Singh, a Sikh, likewise complains that no Sikh religious services are provided.  Ex. 12, S. Singh Dec. ¶ 7.  Mr. Thea, a practicing Catholic, has no opportunity to attend Catholic services or consult with a priest.  Ex. 7, A. Thea Dec. at ¶ 13.  Detainee Marlon Escoto Cortez attempted to hold a Bible study group with about 15 other detainees in a common area of his building.  They were told by an officer to stop praying, and they did not have the right to assemble or pray.  Ex. 9, M. Escoto Cortez Dec. ¶ 9.  Mr. O. Diallo, a practicing Muslim, is forced to complete his prayers on the floor of his cell and has no access to an Imam or group services.  Ex. 18, O. Diallo Dec. at ¶ 2.

72.     Defendants confiscated from Plaintiffs and the other detainees imprisoned at Victorville all religious headwear, jewelry, and other religious items.  The detainees have been unable to replace those items.  Plaintiffs Gurjinder Singh and Atinder Paul Singh have both had their turbans and kara bracelets confiscated.  Atinder Paul Singh has made repeated requests for a head covering and was told it was not allowed.  *See* Ex. 4, A.P. Singh Dec. at ¶ 9; Ex. 5, G. Singh Dec. at ¶ 6 (in response to multiple requests, was told "[turban and kara] are in [his] personal property"); *see also* Ex. 12, S. Singh Dec. at ¶ 4-9 (Sikh religious headwear and bracelet taken away).

73.     Plaintiffs and other detainees are also denied access to religious texts.  Plaintiff Aquino reported that "I had a Bible in my backpack when I crossed the border.  I have asked to have it back but was told I couldn't.  I have seen other detainees ask for Bibles, and they were told there weren't any in Spanish."  Ex. 6, N. Granados Aquino at ¶¶ 24-25.  *See also* Ex. 18, O. Diallo

Dec. at ¶ 3; Ex. 15, J. Rodriguez Rivera Dec. at ¶ 15 (in response to multiple requests for a Bible, detainee told "there are no Bibles here.").

74.    Some Sikh detainees, including Plaintiff A.P. Singh, were told that they could purchase religious head coverings for $10 at the commissary. *See* Ex. 4, A.P. Singh Dec. at ¶ 10.  Not all of the detainees have money on their books to be able to purchase their covering.  None of the detainees has received a head covering.  *Id.*

75.    Plaintiffs and other detainees are not offered diets that comport with their religious beliefs.  Vegetarian meals offered to members of the Sikh faith are woefully inadequate nutritionally.  Plaintiffs G. Singh and A.P. Singh and other practicing Sikhs have been forced to go hungry to avoid food that violates their religious beliefs.  *See* Ex. 5, G. Singh Dec. ¶ 7; Ex. 4, A.P. Singh Dec. ¶ 11.

76.    Plaintiffs and the other detainees hold sincere religious beliefs that counsel them to engage in a variety of religious practices including the attendance of worship services, participation in congregate worship and group prayer, and consultation with clergy and religious leaders; the consumption of a religiously mandated diet; the wearing of religious headgear and jewelry; the use of other religious items; and the reading and study of religious texts.

77.    Defendants' refusal to provide detainees with religious services and clergy access, and their refusal to meet detainees' religious dietary needs, as well as their restrictions on religious items and texts, severely impede or outright prevent Plaintiffs and the other detainees from practicing these sincerely held religious beliefs and force them to violate their religious beliefs in many instances.  Plaintiffs' and the other detainees' inability to freely practice these religious beliefs has been—and continues to be—a cause of immeasurable distress for them.

78.     Defendants' conduct vis-à-vis the Plaintiffs' and the other detainees' religious practices does not comply with either ICE or the BOP's written policies, which expressly permit the very sort of religious practices that detainees seek to engage in here.

**E.     The Conditions at Victorville are Unnecessarily Restrictive and Punitive**

79.     Plaintiffs and other detainees are subjected to conditions at Victorville that are unnecessarily restrictive to fulfill the government's purported objectives of ensuring that immigrants appear at future immigration proceedings.

80.     Upon transferring Plaintiffs and other detainees to Victorville, Defendants maintained a 24-hour lockdown for three or more days, during which time Plaintiffs were not allowed to leave their cells for any reason, including exercise, free time, telephone calls, religious services, personal or attorney visits, meals, or showers.  *See* Ex. 4, A.P. Singh Dec. ¶ 8 (Plaintiff was not allowed to make a phone call for the first week he was at Victorville); Ex. 5, G. Singh ¶ 7 (Plaintiff was kept in his cell the first few days after he arrived); Ex. 17, P. Jaimez Bueno Dec. at ¶ 7 ("I spent the first three or four days in FCI-II Victorville locked in my cell."); Ex. 11, R. Padilla Flores Dec. at ¶ 3 ("The first three days I was here, we were constantly locked in our cells 24-hours a day."); Ex. 8, O. Colindres Velasquez Dec. at ¶ 16 (describing lock down "for about four days without clean clothes or showers").

81.     Victorville was so unprepared for the influx of detainees in June that Defendants issued to the men only one set of clothing upon their arrival at Victorville.  Defendants did not issue another set of clean clothing, including clean undergarments, to detainees for approximately the first two to three weeks the detainees were at the prison.  Plaintiff Atinder Paul Singh, who arrived at Victorville in June soon after detainees were sent to the prison,

reports that he went for 15 days with one prison uniform before he was provided a new one, and he had to wash the uniform in the sink in his cell. Ex. 4, A.P. Singh Dec. ¶ 3.  Mr. Rodriguez Rivera reported that for over a month, he washed his prison jumpsuit with hand soap in the toilet in his cell because of the lack of clean clothing or laundry services.  The only clean jumpsuit offered to Mr. Rodriguez Rivera was size 8X—so large that he could not move while wearing it.  *See* Ex. 15, J. Rodriguez Rivera Dec. at ¶ 23.  *See also* Ex. 10, E. Berrios Banegas Dec. at ¶ 9 (had only one set of clothing for three weeks); Ex. 9, M. Escoto Cortez Dec. at ¶ 11 (same); Ex. 17, P. Jaimez Bueno Dec. at ¶ 11 (same).

82.    Plaintiffs' time outside of their prison cells is extremely limited. The prison provides, at most, a few hours per week of outdoor exercise time; this time is not regularly scheduled and is sometimes canceled.  *See* Ex. 10, E. Berrios Banegas Dec. at ¶ 4; Ex. 17, P. Jaimez Bueno Dec. at ¶ 10 (describing outdoor exercise as one or two hours per week); Ex. 15, J. Rodriguez Rivera Dec. at ¶ 20 (describing outdoor exercise as once per week for 40 minutes).

83.    The amount of time that Plaintiffs are permitted to spend in indoor common areas is also severely limited.  Defendants require Plaintiffs and other immigration detainees to be locked in their cells whenever the prison's general population of prisoners are being moved throughout the facility, resulting in several hours of lockdown each day that Plaintiffs would not experience if they were not being imprisoned in the same facility as prisoners.  *See* Ex. 10, E. Berrios Banegas Dec. at ¶ 5 (describing extremely limited out of cell time); Ex. 9, M. Escoto Cortez Dec. at ¶ 6 (same); Ex. 11, R. Padilla Flores Dec. at ¶ 3 (lockdown 24 hours per day on weekends for the first month at Victorville).

84.    From June 8 through July 13, 2018, there were no clocks anywhere in the cell blocks in which the Plaintiffs and other civil detainees are

imprisoned.  As a result, they had no way to tell the time of day or to mark the passage of time, which added to their sensory deprivation and disorientation.

85.    Detainees have no access to educational or other programming, work opportunities, or even reading materials in languages they understand. For example, Plaintiff Atinder Paul Singh reports that there are no books in his building in a language he can understand.  Ex. 4, A.P. Singh Dec. at ¶ 7. Mr. Rodriguez Rivera was detained alone in a small cell, with no radio or television.  There was one TV in the common space of his housing unit, which he could see through the door of his cell, but the television was muted throughout the day.  Mr. Rodriguez Rivera was unable even to access a book in Spanish for over a month, despite his repeated requests.  Ex. 15, J. Rodriguez Rivera Dec. at ¶ 14.

86.    Plaintiff Marcel Ngwa read in the Inmate Handbook he was given upon arrival at Victorville the list of classes available at the prison.  When he asked whether he could take any of the classes listed there to improve his reading and writing, ICE officials responded, "sorry, [you] couldn't."  Ex. 2, M. Ngwa Dec. at ¶ 8.  On information and belief, these programs are available only to inmates at Victorville and not to ICE detainees.

87.    The Plaintiffs and other civil detainees are forced to wear prison uniforms, and when they are transported to or from Victorville, they are shackled like convicted prisoners.  Their hands are cuffed to belly chains, and they wear ankle shackles that connect their feet via a short chain that severely limits their ability to walk normally.  Plaintiff Aquino reports that "[w]hen I was moved to Victorville, I was shackled.  I had handcuffs on my wrists and they were tied to a belly chain.  I also had a chain between my ankles and cuffs around my ankles.  The ankle cuffs cut my skin. . . .  We were shackled for the whole bus ride, which was 4 or 5 hours long.  I have never been chained like that in my life."  Ex. 6, N. Granados Aquino Dec. at ¶ 5.

88.     Upon his arrival at Victorville, Plaintiff Aquino was informed by an officer that "the more food you ask for, the less we're going to give you. The more you ask us to let you out, the less we're going to." *Id. at* 6.  Mr. Granados Aquino was still shackled at the time.  *Id.*  Correctional officers at Victorville informed Plaintiff Teneng that "the rules at a federal prison are stricter than a jail."  Ex. 1, S. Teneng Dec. at ¶ 7.

89.     When he was suffering excruciating pain from a kidney stone, Plaintiff Antush Kumar was transported to the hospital in full shackles.  While at the local hospital receiving treatment, he was chained to the hospital bed despite the lack of any indicia that he was a threat to any others in the hospital. Ex. 3, A. Kumar Dec. ¶¶ 7-8.

90.     As a result of the many hours of imprisonment in cells, with no reading material, no religious or other programming, and virtually no information about the processing of their immigration and/or asylum proceedings, Plaintiffs and other ICE detainees are suffering from anxiety, fear, apprehension, enforced idleness, fatigue, and, in many instances, depression, including suicidal ideation.

91.     Faced with harsh, punitive conditions, some detainees have been coerced into abandoning their immigration claims and returning to their home countries rather than remain incarcerated at Victorville.  Emerson Berrios Banegas, who had planned to seek asylum, reported, "I signed papers agreeing to be deported.  I do not want to go back but I signed the papers because I do not like being treated like a criminal prisoner."  *See* Ex. 10, E. Berrios Banegas Dec. at ¶ 3.  Detainees who came to this country to exercise their right to seek asylum have expressed shock at the conditions of their confinement.  Plaintiff Teneng said, "I didn't expect to be sent to prison.  I came here as an asylum seeker, seeking liberty."  Ex. 1, S. Teneng Dec. at ¶ 17.  Similarly, Mr. Diallo

said, "I don't understand why I am being held in a prison since I am just an immigrant asking for asylum." Ex. 18, O. Diallo Dec. at ¶ 10

92. Plaintiffs are detained ostensibly to ensure their appearance at immigration proceedings, but detainees report that they have not spoken to ICE officials regarding their cases. Plaintiff Aquino reports that he has been unable to access information about his immigration case. Ex. 6, N. Granados Aquino Dec. at ¶ 19. Detainees have been told that their immigration cases will not proceed until they are moved to an immigration detention center, such as the nearby Adelanto facility. ICE agents told Mr. Granados Aquino "to think of Victorville like a hotel." *Id.*

93. These individuals are not being detained because they stand accused of a crime, much less convicted of one. Yet the conditions under which these civil detainees are being imprisoned are no better than, and in some instances worse than, the conditions to which the population of convicted prisoners at Victorville is subjected.

94. On information and belief, ICE routinely detains immigrants in conditions that are far less restrictive and punitive than those at Victorville. The conditions to which Defendants are subjecting Plaintiffs and other detainees violate their own standards applicable at other facilities where ICE detainees are held.

95. Significantly less restrictive and more humane means exist of ensuring civil detainees' appearance at immigration proceedings. For example, Defendants offer to some individuals the opportunity to parole into the United States on their own recognizance. Additionally, Defendants maintain a bond system whereby individuals may be released upon posting a cash bond as low as $1,500. Some released individuals are required to wear a GPS-enabled ankle monitoring device while others are not.

96.     The conditions of confinement at Victorville, and the very deprivation of the Plaintiffs' liberty, are excessive in relation to, and not reasonably related to, the legitimate objective of ensuring Plaintiffs' and other detainees' appearances at future immigration proceedings.

97.     The BOP's Program Statement on Religious Beliefs and Practices, Victorville USP's Inmate Handbook, and ICE's Religious Practices and Policy all represent less restrictive means that could be used by Defendants.

## II.     INJUNCTIVE RELIEF

98.     Plaintiffs re-allege and incorporate by reference paragraphs 1-97 of this Complaint as if fully set out herein.

99.     Plaintiffs and the putative class are entitled to preliminary and permanent injunctive relief.

100.    Defendants have acted, and threaten to act, to deprive Plaintiffs, and the others they seek to represent, of their constitutional and statutory rights.

101.    Plaintiffs and those similarly situated have suffered irreparable physical and psychological injury and the loss of fundamental due-process and religious-exercise rights.  They have been and will continue to be subjected to serious risk of irreparable harm as the result of imprisonment at Victorville.

102.    Defendants have been and are aware of the conditions and deprivations complained of herein.  In the alternative, Defendants have acted with deliberate indifference regarding the conduct and conditions described herein.

103.    Plaintiffs and putative class members have no plain, adequate, or speedy remedy at law.

## III.    CLASS ACTION ALLEGATIONS

104.    Plaintiffs re-allege and incorporate by reference paragraphs 1-103 of this Complaint as if fully set out herein.

105.   Plaintiffs Stephenson Awah Teneng, Marcel Ngwa, Ankush Kumar, Gurjinder Singh, Atinder Paul Singh, and Noe Mauricio Granados Aquino bring this action on behalf of themselves and all other persons who are similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(2), and in compliance with Local Rule 23-3.

106.   With respect to the First Claim herein, Plaintiffs seek to represent a class (the "Civil Detainee Class") consisting of:  "All persons who are now, or in the future will be, in the legal custody of the U.S. Immigrations and Customs Enforcement ('ICE') and housed at Federal Correctional Institution ('FCI') Victorville."

107.   There are multiple questions of law and fact common to the putative Civil Detainee Class, including:

>     a.   The sufficiency of access to medical and mental health care for civil detainees at Victorville;
>     b.   The sufficiency of access to adequate nutrition for civil detainees at Victorville;
>     c.   Whether the conditions at Victorville are unnecessarily restrictive and/or punitive;
>     d.   Whether civil detainees at Victorville are confined in conditions similar to, or more restrictive than, persons convicted of criminal offenses; and
>     e.   Whether deprivation of the aforementioned results in constitutional or statutory violations.

108.   The putative Civil Detainee Class is so numerous that joinder of all members would be impracticable.  There are currently approximately 1,000 civil detainees imprisoned at Victorville.  The putative Civil Detainee Class is fluid, with detainees arriving at and leaving Victorville every day, making joinder of all members not just impracticable but impossible.

109.   Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair their ability to protect their interests.

110.   The claims of the Plaintiffs are typical of the claims of the putative Civil Detainee Class.  Each of the Plaintiffs, like all putative class members in the Civil Detainee Class, is a civil detainee at Victorville, subject to the same conditions of confinement challenged here.  The claims of the Plaintiffs arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Civil Detainee Class's claims are.

111.   All of the Plaintiffs will fairly and adequately represent the interests of all members of the putative Civil Detainee Class because they seek relief on behalf of the class they represent as a whole and have no interest antagonistic to other members of the class.  The plaintiffs are represented by counsel from the Prison Law Office; the Civil Rights Education and Enforcement Center; and the American Civil Liberties Union ("ACLU") National Prison Project and ACLU Program on Freedom of Religion and Belief.  Counsel are experienced in class action, complex litigation, detention and prisoners' rights litigation, religious liberty law, and constitutional law generally.

**Religious Freedom Subclass**

112.   With respect to the Second and Third Claims herein, Plaintiffs Marcel Ngwa, Atinder Paul Singh, Gurjinder Singh, and Noe Mauricio Granados Aquino further seek to represent a subclass (the "Religious Freedom

Subclass") consisting of: "All religious persons who are now, or in the future will be, in the legal custody of ICE and housed at FCI Victorville, and whose ability to practice their religious beliefs is or would be impeded or substantially burdened by Defendants' policies and practices."

113.   There are multiple questions of law and fact common to the putative Religious Freedom Subclass, including:

      a.  The sufficiency of access to religious services or other adequate opportunities for group prayer, congregate worship, or consultation with clergy for civil detainees at Victorville;

      b.  The sufficiency of access to meals that comport with detainees' religious beliefs for civil detainees at Victorville;

      c.  The sufficiency of access to the possession and wearing of religious headwear, jewelry, and other religious items for civil detainees at Victorville;

      d.  The sufficiency of access to religious texts for civil detainees at Victorville;

      e.  Whether deprivation of the aforementioned impermissibly infringes on detainees' religious exercise; and

      f.  Whether deprivation of the aforementioned results in constitutional or statutory violations.

114.   The putative Religious Freedom Subclass is so numerous that joinder of all members would be impracticable.  The precise number of the subclass is difficult to ascertain, as Defendants do not track or report detainees' religious beliefs, but upon information and belief, Plaintiffs estimate that it is at least 150.  Moreover, the putative Religious Freedom Subclass is fluid, with detainees arriving at and leaving Victorville every day, making joinder of all members not just impracticable but impossible.

115.   Prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of other members not parties to the individual adjudications or would substantially impair their ability to protect their interests.

116.   The claims of Plaintiffs Marcel Ngwa, Atinder Paul Singh, Gurjinder Singh, and Noe Mauricio Granados Aquino are typical of the claims of the putative Religious Freedom Subclass, since their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Religious Freedom Subclass's claims are.

117.   Plaintiffs Marcel Ngwa, Atinder Paul Singh, Gurjinder Singh, and Noe Mauricio Granados Aquino will fairly and adequately represent the interests of all members of the putative Religious Freedom Subclass because they seek relief on behalf of the class they represent as a whole and have no interest antagonistic to other members of the class.  The plaintiffs are represented by counsel from the Prison Law Office; the Civil Rights Education and Enforcement Center; and the American Civil Liberties Union ("ACLU") National Prison Project and ACLU Program on Freedom of Religion and Belief.  Counsel are experienced in class action, complex litigation, detention and prisoners' rights litigation, religious liberty law, and constitutional law generally.

## IV.   CLAIMS FOR RELIEF

### FIRST CLAIM
**(Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution)**

118.   Plaintiffs re-allege and incorporate by reference paragraphs 1-116 of this Complaint as if fully set out herein.

31

119.   Due process prohibits the use of detention as a means of punishing civil detainees. *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001) (acknowledging that immigration detention is civil); *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004); *King v. County of Los Angeles*, 885 F.3d 548 (9th Cir. 2018).

120.   As the United States Court of Appeals for the Ninth Circuit has held, "*[A civil] detainee is entitled to 'more considerate treatment' than his criminally detained counterparts. . . .* Therefore, when a [civil] detainee is confined in conditions *identical to, similar to, or more restrictive than* those in which criminal counterparts are held, we presume that the detainee is being subjected to 'punishment.'" *Jones*, 393 F.3d at 933 (citations omitted) (emphasis added).

121.   As an initial matter, BOP policy makes clear that that ICE detainees at Victorville are equivalent to criminal "pre-trial inmates."[9]  The *Jones* presumption is therefore triggered in this case.

122.   In addition, conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, or that are excessive in relation to that objective, constitute punishment in violation of the due process clause.

123.   The conditions of confinement at Victorville for immigration civil detainees violate the Due Process Clause.

124.   For example, Defendants have deprived and continue to deprive Plaintiffs and putative class members imprisoned at Victorville of adequate and necessary health care by, without limitation:

        a.   Failing to provide sufficient medical and mental health screenings to civil detainees upon their arrival at

---

[9] *See* BOP Program Statement 7331.04, *available at* https://www.bop.gov/policy/progstat/7331_004.pdf.

Victorville.  As a result of Defendants' actions, Plaintiffs and other civil detainees have not received adequate medical or mental health care for conditions existing at the time they arrived at Victorville, or that have arisen since their imprisonment there.

   b.  Failing to staff Victorville with adequate numbers of qualified medical or mental health care providers and custody staff to service the civil detainee population.

   c.  Failing to provide a method by which Plaintiffs and other detainees can seek non-emergency medical or mental health care when in their cells, or by which they can seek any sort of medical or mental health care when outside of their cells.

   d.  Failing to respond to Plaintiffs' or other detainees' requests for emergency help, including by using the emergency button located in their cells.

   e.  Failing to respond to Plaintiffs' non-emergency requests for medical care, and failing to follow-up on known medical and mental health concerns.

125.   As a result of Defendants' practices and policies, Plaintiffs are exposed to a significant risk of serious harm to which Defendants are deliberately indifferent, in violation of Plaintiffs' rights under the Due Process clause of the Fifth Amendment.

126.   In addition, Defendants are systemically failing to provide adequate nutrition to Plaintiffs by serving meals that are inedible or of insufficient size or nutritional value, and by denying Plaintiffs adequate time to eat the food they are provided.  As a result of Defendants' policies and practices, Plaintiffs do not receive adequate nutrition at Victorville, creating a substantial risk of serious harm to which Defendants are deliberately

indifferent, in violation of Plaintiffs' rights secured by the Due Process clause of the Fifth Amendment.

127.   Defendants severely limit Plaintiffs' access to outdoor exercise to only a handful of hours each week and such limited and inadequate opportunities to exercise outside are not regularly scheduled.

128.   Defendants severely limit Plaintiffs' out-of-cell time by maintaining a policy under which Plaintiffs are on lockdown several times throughout the day in order to accommodate the movement of Victorville's prisoner population.

129.   Defendants have impeded Plaintiffs' and other detainees' ability to practice their faith by refusing to provide religious services and meals that meet detainees' religious needs, severely impeding detainees' ability to wear and possess religious items, and denying detainees access to religious texts, among other restrictions.

130.   The conditions described herein, which are illustrative and not exhaustive, violate the Due Process clause because they, individually and collectively: (a) are identical to, similar to, or more restrictive than those in which persons convicted of criminal offenses at Victorville are confined; (b) are expressly intended to punish; (c) are not reasonably related to legitimate governmental objectives; and/or (d) are excessive in relation to those objectives.

### SECOND CLAIM

### (Violation of the Free Exercise Clause of the First Amendment)

131.   Plaintiffs re-allege and incorporate by reference paragraphs 1-130 of this Complaint as if fully set out herein.

132.   By Defendants' conduct alleged above, they have violated, and continue to violate, Plaintiffs' and the other detainees' rights under the Free Exercise Clause of the First Amendment to the U.S. Constitution.

34

133.   Defendants' restriction of Plaintiffs' and other detainees' ability to exercise their religion, as described in detail above, is not narrowly tailored to further a compelling governmental interest.  Nor is there a rational basis or legitimate penological interest upon which Defendants may justify their conduct, especially in light of the Defendants' own written policies pertaining to religious exercise and the distinctions between civil immigration detainees and convicted persons.

### THIRD CLAIM

**(Violation of the Religious Freedom Restoration Act, 42 U.S.C § 2000bb, et seq.)**

134.   Plaintiffs re-allege and incorporate by reference paragraphs 1-133 of this Complaint as if fully set out herein.

135.   Defendants' policies and practices restricting and impeding Plaintiffs' and the other detainees' religious exercise, as described above, substantially burden Plaintiffs' and the other detainees' exercise of their sincerely held religious beliefs.  Because of Defendants' conduct, Plaintiffs and the other detainees have been, and continue to be, severely impeded or prevented outright from attending religious services, engaging in congregate worship and group prayer, consulting with clergy and religious leaders, following religious requirements for their diet, wearing religious headgear and religiously significant jewelry, possessing other religious items, and accessing religious texts for reading and religious study.  Unless this Court intervenes, Plaintiffs and the other detainees will be forced to abandon, or significantly limit, their religious practices and violate their sincerely held religious beliefs throughout their entire imprisonment at Victorville.

136.   Under RFRA, Defendants may not impose these substantial burdens on Plaintiffs and the other detainees unless they can demonstrate that

doing so is the least restrictive means of furthering a compelling governmental interest.

137.   Defendants have no compelling interest in treating Plaintiffs and the other detainees in this manner.

138.   Even if Defendants could identify a compelling interest to support their policies and practices pertaining to detainees' religious exercise, they have not used the least restrictive means to further that interest.  The BOP's Program Statement on Religious Beliefs and Practices, Victorville USP's Inmate Handbook, and ICE's Religious Practices and Policy all represent less restrictive means that could be used by Defendants.  To eliminate the substantial burdens on Plaintiffs' and the other detainees' religious exercise, Defendants could also simply release Plaintiffs and the other detainees from imprisonment at Victorville, in the same manner that civil detainees have previously been treated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to exercise its federal question jurisdiction over this actual controversy and:

(a)   certify the Civil Detainee Class and Religious Freedom Sub-Class as proposed above, appoint the Named Plaintiffs to serve as representatives of those two Classes and appoint undersigned counsel to represent the two Classes;

(b)   enter an order preliminarily and permanently enjoining Defendants from imprisoning Plaintiffs, or any member of the Civil Detainee Class, at Victorville, and set a date certain by which all such detainees must be removed therefrom;

(c)   enter an order preliminarily and permanently enjoining Defendants from depriving Plaintiffs:

i.   of minimally adequate health care;

ii.    of adequate food, clean non-prison uniform clothing, freedom of movement, and other programming or activities that do not cause physical, emotional, and psychological harm and other affronts to basic human dignity;

iii.    of their constitutional and statutory rights to exercise their freedom of religion;

iv.    of their rights to due process of law as a result of their being imprisoned  at Victorville, in conditions that are excessive and constitute punishment;

(d)    award Plaintiffs their attorneys' fees and costs; and

(e)    enter such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: August 1, 2018

   /s/ Margot K. Mendelson
Margot K. Mendelson
CA #268583
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, CA 94710

37