Donald Specter, Cal. #083925
dspecter@prisonlaw.com
Corene T. Kendrick, Cal. #226642
ckendrick@prisonlaw.com
Margot K. Mendelson, Cal. #268583
mmendelson@prisonlaw.com
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, CA 94710
Phone: (510) 280-2621
Fax: (510) 280-2704

**[ADDITIONAL COUNSEL ON FOLLOWING PAGE]**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| STEPHENSON AWAH TENENG, MARCEL NGWA, ANKUSH KUMAR, GURJINDER SINGH, ATINDER PAUL SINGH, NOE MAURICIO GRANADOS AQUINO, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States, KIRSTJEN NIELSEN, Secretary Department of Homeland Security; RONALD D. VITIELLO, Acting Director, Immigration and Customs Enforcement; DAVID MARIN, Field Office Director, Los Angeles Field Office of Immigration and Customs Enforcement; JEFFERSON BEAUREGARD SESSIONS, III, U.S. Attorney General; HUGH J. HURWITZ, Acting Director, Federal Bureau of Prisons, DAVID SHINN, Warden, FCI Victorville Medium Security Prison I/II, in their official capacities only, <br><br> Defendants | Case No. 5:18-CV-01609 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **ORAL ARGUMENT REQUESTED** <br><br> DATE:     October 15, 2018 <br> TIME:     9:00 AM <br> JUDGE:     Hon. Jesus G. Bernal <br> CRTRM:     1 |

David C. Fathi, Wash. #24893*
dfathi@aclu.org
Daniel Mach, D.C. #461652**
dmach@aclu.org
Victoria Lopez, Ill. #6275388*
vlopez@aclu.org
Heather L. Weaver, Cal. # 226853
hweaver@aclu.org
**ACLU FOUNDATION**
915 15th St. N.W., 7th Floor
Washington, DC 20005
Phone: (202) 548-6603
Fax: (202) 393-4931

*Admitted *pro hac vice*. Not admitted in DC;
practice limited to federal courts

**Admitted *pro hac vice*.

Timothy Fox, Cal. #157750
tfox@creeclaw.org
Elizabeth Jordan, La. Bar Roll No. 35186*
ejordan@creeclaw.org
**CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER**
104 Broadway, Suite 400
Denver, CO 80203
Phone: (303) 757-7901
Fax: (303) 593-3339

*Admitted *pro hac vice*. Not admitted in Colorado.

Nancy E. Harris, Cal. # 197042
nharris@meyersnave.com
Ellyn L. Moscowitz, Cal. # 129287
emoscowitz@meyersnave.com
Jason S. Rosenberg, Cal. # 252243
jrosenberg@meyersnave.com
**MEYERS, NAVE, RIBACK, SILVER & WILSON**
555 12th St., Suite 1500
Oakland, CA 94607
Telephone: (510) 808-2000
Facsimile: (510) 444-1108

Anne E. Smiddy, Cal. # 267758
asmiddy@meyersnave.com
**MEYERS, NAVE, RIBACK, SILVER & WILSON**
101 W. Broadway, Suite 1105
San Diego, CA 92101
Telephone: (619) 569-2099
Facsimile: (619) 330-4800

Attorneys for Plaintiffs, on *behalf of*
*themselves and others similarly situated*

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD HEREIN:

NOTICE IS HEREBY GIVEN that on October 15, 2018 at 9:00 AM or as soon thereafter as the matter may be heard by the above Court, located at Riverside, California, Plaintiffs Stephenson Awah Teneng, Marcel Ngwa, Ankush Kumar, Gurjinder Singh, Atinder Paul Singh, and Noe Mauricio Granados Aquino, on behalf of themselves and all others similarly situated, move this Court to grant a class-wide preliminary injunction[1] enjoining Defendants from:

> (a) providing constitutionally inadequate health care to ICE detainees at FCI Victorville;
>
> (b) subjecting ICE detainees at FCI Victorville to conditions and practices that amount to punishment; and
>
> (c) transferring any additional ICE detainees to FCI Victorville.

On behalf of themselves and all others similarly situated, Plaintiffs Ngwa, Gujinder Singh, Atinder Paul Singh, and Noe Mauricio Granados Aquino additionally move this Court to grant a subclass-wide preliminary injunction, enjoining Defendants from:

> (a) restricting detainees' religious exercise or failing to accommodate detainees' religious exercise in a manner that violates or is otherwise inconsistent with ICE's Detention Standards; and
>
> (b) transferring any additional ICE detainees who are religious to FCI Victorville.

This Motion is based on this Notice of Motion, the accompanying

---

[1] Pursuant to Local Rule 7-3, Plaintiffs' counsel conferred with counsel for the Defendants regarding this motion on September 5, 2018. *See* Doc. 42-1 ¶¶ 2-3.

Memorandum of Points and Authorities, the supporting declarations, all pleadings and papers filed in this action, and such additional papers and arguments as may be presented at or in connection with the hearing.

DATED:  September 11, 2018          Respectfully submitted,


                                              By:  /s/ Margot Mendelson
**ACLU FOUNDATION**                       **PRISON LAW OFFICE**
David C. Fathi                            Don Specter
Daniel Mach                               Corene Kendrick
Victoria Lopez                            Margot Mendelson
Heather L. Weaver                         **Attorneys for Plaintffs**

**CIVIL RIGHTS EDUCATION AND**            **MEYERS, NAVE, RIBACK, SILVER &**
**ENFORCEMENT CENTER**                    **WILSON**
Timothy Fox                               Nancy E. Harris
Elizabeth Jordan                          Jason S. Rosenberg
                                          Ellyn L. Moscowitz
                                          Anne E. Smiddy

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.      INTRODUCTION ........................................................................................... 1

II.     BACKGROUND ............................................................................................. 3

    A.      The Conditions for ICE Detainees at FCI Victorville Are Similar to, or Worse than, Those of Criminal Prisoners ....................................... 3

    B.      Defendants' Practices and Conditions of Confinement at FCI Victorville Violate ICE's Detention Standards ....................................... 8

    C.      Defendants Deny Minimally Adequate Health Care to ICE Detainees at FCI Victorville. ....................................................................... 9

        1.      Defendants Fail to Provide Adequate Intake Health Screening. ...................................................................................... 10

        2.      Defendants Do Not Provide Emergency and Routine Health Care. ................................................................................ 12

        3.      Defendants Do Not Provide Minimally Adequate Mental Health Care. ................................................................................ 13

        4.      Defendants Do Not Provide Adequate Medication. ................... 15

        5.      Custody Staff Use Threats and Retaliation to Improperly Interfere with Health Care. ......................................................... 15

    D.      Defendants Have Severely Limited Detainees' Religious Exercise. ................................................................................................... 16

III.    ARGUMENT .................................................................................................. 18

    A.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIFTH AMENDMENT CLAIM REGARDING EXCESSIVELY PUNITIVE CONDITIONS OF CONFINEMENT. ................................................................................... 19

        1.      Incarcerating ICE Detainees at FCI Victorville Is Inherently Punitive ...................................................................... 20

        2.      The Conditions at FCI Victorville Are Unconstitutional Because They Are Excessive in Relation to the Government Objective and Because Detainees Are Subjected to Similar, or Worse, Conditions Than Convicted Prisoners. ................................................................. 21

    B.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIFTH AMENDMENT CLAIM REGARDING DENIAL OF ADEQUATE HEALTH CARE. ...................................... 24

1.   Minimal Requirements of a Prison Health Care System............25

2.   Defendants' Failure to Provide Adequate Intake Health Screening Violates the Constitution. ............................................26

3.   Defendants' Failure to Provide Access to Emergency and Routine Health Care Violates the Constitution. .........................28

4.   Defendants' Failure to Provide Adequate Mental Health Care Violates the Constitution......................................................29

5.   Defendants' Failure to Provide Adequate Medication Violates the Constitution. ...........................................................29

6.   Custody Staff Violate the Constitution by Using Threats and Retaliation to Improperly Interfere with Health Care. ........30

C.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR RFRA CLAIM. ....................................................30

1.   FCI Victorville's Limitations on Religious Expression and Practices Substantially Burden Detainees' Religious Exercise......................................................................................31

2.   FCI Victorville's Religious-Exercise Restrictions Are Not the Least Restrictive Means Available to Defendants................33

D.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH IN PLAINTIFFS' FAVOR.....................................................37

IV.   CONCLUSION ................................................................39

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011) ................................................................... 19

*Am. Trucking Ass'ns, Inc. v. City of L.A.,*
 559 F.3d 1046 (9th Cir. 2009) ................................................................... 37

*Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir. 1995),
 *opinion amended on denial of reh'g,* 75 F.3d 448 (9th Cir. 1995) ...................... 28

*Arnett v. Webster,*
 658 F.3d 742 (7th Cir. 2011) ................................................................... 29

*Balla v. Idaho State Bd. of Corr.,*
 595 F. Supp. 1558 (D. Idaho 1984) ........................................................... 29

*Bell v. Wolfish,*
 441 U.S. 520 (1979) ........................................................................ 19-20

*Brown v. Plata,*
 563 U.S. 493 (2011) ............................................................................ 26

*Casey* v. *Lewis,*
 834 F.Supp. 1477 (D. Ariz. 1993) .......................................................... 27, 30

*Castro v. Cnty. of L.A.,*
 833 F.3d 1060 (9th Cir. 2016) ................................................................... 22

*Coleman v. Wilson,*
 912 F. Supp. 1282 (E.D. Cal. 1995) ....................................................... 27, 29, 30

*Cutter v. Wilkinson,*
 544 U.S. 709 (2005) ............................................................................ 32

*Davies v. L.A. Cnty. Bd. of Supervisors,*
 177 F. Supp. 3d 1194 (C.D. Cal. 2016) ......................................................... 37

*Doe v. Kelly,*
 878 F.3d 710 (9th Cir. 2017) .............................................................. 22, 38-39

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES

*Doty v. Cnty. of Lassen*,
    37 F.3d 540 (9th Cir. 1994) ................................................................. 30

*Estelle v. Gamble*,
    429 U.S. 97 (1976) ............................................................................ 31

*Farris v. Seabrook*,
    677 F.3d 858 (9th Cir. 2012) ............................................................. 18

*Flores v. Sessions*,
    Case No. 2:85-cv-04544-DMG-AGR, (C.D. Cal. June 21, 2018) ...... 21

*Franco-Gonzalez v. Nielsen*,
    Case No. 2:10-cv-02211-DMG-DTB, (C.D. Cal. Aug. 17, 2018) ...... 11

*Gartrell v. Ashcroft*,
    191 F. Supp. 2d 23 (D.D.C. 2002) ................................................ 33, 37

*Gates v. Cook*,
    376 F.3d 323 (5th Cir. 2004) ......................................................... 29-30

*Gordon v. Cnty. Of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ........................................................... 25

*Greene v. Solano Cnty. Jail*,
    513 F.3d 982 (9th Cir. 2008) ......................................................... 31, 32

*Harbor Missionary Church Corp. v. City of San Buenaventura*,
    642 F. App'x 726 (9th Cir. 2016) ...................................................... 31

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
    366 F.3d 754 (9th Cir. 2004) ............................................................. 37

*Harris v. Escamilla*, No. 17-15230, 2018 WL 2355123
    (9th Cir. May 24, 2018) ..................................................................... 33

*Helling v. McKinney*,
    509 U.S. 25 (1993) ............................................................................ 26

*Hernandez v. Cnty. of Monterey*,
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ............................................... 19

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ................................................. 19, 20, 37

*Holt v. Hobbs*,
    135 S. Ct. 853 (2015)...................................................................31, 34, 36

*Hoptowit v. Ray*,
    682 F.2d 1237 (9th Cir. 1982), *overruled on other grounds by*
    *Sandin v. Conner*, 515 U.S. 472 (1995) ....................................25-26, 28

*Innovation Law Lab v. Nielsen*,
    310 F. Supp. 3d 1150 (D. Or. 2018)..................................................39

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)........................................................................23

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ...............................................................37

*Jones v. Blanas*,
    393 F.3d 918 (9th Cir. 2004) ...................................................*passim*

*Jones v. Williams*,
    791 F.3d 1023 (9th Cir. 2015) ...........................................................31

*Kansas v. Crane*,
    534 U.S. 407 (2002) .........................................................................21

*Kansas v. Hendricks*,
    521 U.S. 346 (1997) .........................................................................21

*King v. Cnty. of Los Angeles*,
    885 F.3d 548 (9th Cir. 2018) ...............................................22-23, 24, 25

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995)...................................26-27, 28, 30

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .............................................................37

*Merrick v. Inmate Legal Servs.*,
    650 F. App'x 333 (9th Cir. 2016)......................................................32

*Miller v. Carlson*,
    768 F. Supp. 1331 (N.D. Cal. 1991*)*.................................................39

*Nance v. Miser*,
    700 F. App'x 629 (9th Cir. 2017).....................................................32

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES

*Ortiz v. Downey*,
  561 F.3d 664 (7th Cir. 2009) ................................................................ 33

*Peralta v. Dillard*,
  744 F.3d 1076 (9th Cir. 2014) ............................................................. 24

*Pierce v. Cnty. of Orange*,
  526 F.3d 1190 (9th Cir. 2008), *opinion amended and superseded on
  denial of reh'g*, 519 F.3d 985 (9th Cir. 2008) .................................... 24, 31, 32, 33

*Plata v. Schwarzenegger*,
  Case No. C01-1351-TEH, 2005 WL 2932253 (N.D. Cal. 2005) ............. 26, 27, 30

*Procunier v. Martinez*,
  416 U.S. 396 (1974) ............................................................................. 36

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................ 21

*Sammartano v. First Jud. Dist. Ct.*,
  303 F.3d 959 (9th Cir. 2002) ............................................................... 37

*Sharp v. Weston*,
  233 F.3d 1166 (9th Cir. 2000) ............................................................. 22

*Singh v. Goord*,
  520 F.Supp.2d 487 (S.D.N.Y. 2007) .................................................... 33

*Steele v. Shah*,
  87 F.3d 1266 (11th Cir. 1996) ............................................................. 29

*Sutton v. Rasheed*,
  323 F.3d 236 (3d Cir. 2003) ................................................................ 33

*United States v. Navarro-Vargas*,
  408 F.3d 1184 (9th Cir. 2005) ............................................................. 20

*Unknown Parties v. Johnson*, 2016 WL 8188563 (D. Ariz. Nov. 18,
  2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) ............... 22, 25

*Ware v. La. Dep't of Corr.*,
  866 F.3d 263 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1181 (2018) .................... 35

*Warsoldier v. Woodford*,
  418 F.3d 989 (9th Cir. 2005) ............................................................. 31, 36

*Wellman v. Faulkner*,
    715 F.2d 269 (7th Cir. 1983) ............................................................... 30

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008) ......................................................................... 18, 37

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) ............................................................................ 20

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................................ 19

**Federal Statutes and Rules**

42 U.S.C. § 2000bb-1(b) ....................................................................... 30

42 U.S.C. § 2000bb *et seq.* .................................................................... 2

42 U.S.C. § 2000cc-5(7) ........................................................................ 31

42 U.S.C. § 2000cc *et seq* ..................................................................... 31

Federal Rule of Civil Procedure 65 ......................................................... 2

Federal Rule of Civil Procedure 65(c) .................................................... 39

**U.S. Constitution**

First Amendment ....................................................................... 2, 31, 38

Fifth Amendment ............................................................................ *passim*

Eighth Amendment .................................................................. 24, 25, 26

Fourteenth Amendment ...................................................................... 20, 25

**Bureau of Prison Program Statements**

BOP PS 4700.06 Food Service Manual,
    (available at https://www.bop.gov/policy/progstat/4700_006.pdf) ...................... 5

BOP PS 5300.21 Education, Training and Leisure Time Program
    Standards,
    (available at https://www.bop.gov/policy/progstat/5300_021.pdf) ...................... 6

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES

BOP PS 5310.16 Treatment and Care of Inmates with Mental Illness,
(available at https://www.bop.gov/policy/progstat/5310_16.pdf) ......................29

BOP PS 5360.09 Religious Beliefs and Practices,
(available at https://www.bop.gov/policy/progstat/5360_009.pdf) ...........6, 34, 36

BOP PS 5370.11 Inmate Recreation Program,
(available at https://www.bop.gov/policy/progstat/5370_011.pdf) ......................6

BOP PS 6031.04, Patient Care,
(available at https://www.bop.gov/policy/progstat/6031_004.pdf) ......................7

BOP PS 6340.04, Psychiatric Services,
(available at https://www.bop.gov/policy/progstat/6340_004.pdf) ....................27

BOP PS 7331.04, Pretrial Inmates,
(available at https://www.bop.gov/policy/progstat/7331_004.pdf) ......................4

**Other Authorities / News Articles**

*About Our Facilities*, Federal Bureau of Prisons,
https://www.bop.gov/about/facilities/federal_prisons.jsp...............................7, 20

FCC Victorville Inmate Handbook (2015)
https://www.bop.gov/locations/institutions/she/SHE_fdc_aohandbook.pdf ..34-35

FPC Alderson Inmate Handbook (June 2012),
https://www.bop.gov/locations/institutions/ald/ALD_aohandbook.pdf; ...............7

FPC Bryan Inmate Admission and Orientation Handbook (Jan. 22, 2016),
https://www.bop.gov/locations/institutions/bry/BRY_aohandbook.pdf................7

FPC Duluth Inmate Admissions and Orientation Handbook, (Feb. 2010)
https://www.bop.gov/locations/institutions/dth/DTH_aohandbook.pdf...............7

Lauren Gill, *As Immigrant Detainees Are Moved to Prisons, What Happens
to the Prisoners?,* Rolling Stone (July 3, 2018)
https://www.rollingstone.com/culture/culture-features/immigrant-
detainees-victorville-california-prisoners-695215/ .........................................9, 10

Roxana Kopetman, *Immigration detainees in Victorville prison get more scabies, chicken pox; protesters to gather Saturday*, The Orange County Register (June 29, 2018) https://www.ocregister.com/2018/06/29/immigration-inmates-in-victorville-get-more-scabies-chicken-pox-protesters-to-gather-saturday/ ........... 11

Kate Morrissey, *ICE is sending 1,000 immigrant detainees to Victorville prison*, San Diego Union-Tribune (Jun. 7, 2018) http://www.sandiegouniontribune.com/news/immigration/sd-me-victorville-immigrants-20180607-story.html. ....................................... 21

Esme Murphy*, Behind Bars: Denny Hecker's Life in Prison*, CBS Minnesota (May 15, 2011) https://minnesota.cbslocal.com/2011/05/15/a-look-inside-denny-heckers-life-in-prison/ ............................................................................. 8

Dora Schiro, U.S. Dep't of Homeland Security, *Immigration Detention Overview and Recommendations*, (Oct. 6, 2009) ..................................... 3

Lauren Weber, *As Health Conditions Worsen At Prison Holding 1,000 Detainees, Staff Fears A Riot,* Huffington Post (July 2, 2018), *available at* https://www.huffingtonpost.com/entry/victorville-prison-detainees-medical-crisisus5b3abde8e4b07b827cb9ed38 .................................. 9-10

Lauren Weber, *Detainee Attempts Suicide After Trump Administration Jams Migrants Into Troubled Prison*, Huffington Post (Aug. 1, 2018), *available at* https://www.huffingtonpost.com/entry/victorville-prison-suicide-attempt-migrants_us_5b6267cce4b0de86f49dcbda ............................... 14

U.S. Dep't of Justice, Office of Inspector General, *Prisons' Medical Staffing Challenges,* (March 2016) https://oig.justice.gov/reports/2016/e1602.pdf ...................................... 10

U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards ("PBNDS") 2008 ................................... 8-9

U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards ("PBNDS") 2011 .......................................... *passim*

U.S. Customs and Immigration Enforcement, Facility Inspections: Dedicated and Non-Dedicated Facility List, https://www.ice.gov/facility-inspections ............................................... 8

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs and members of the class they seek to represent[2] are immigrants incarcerated at the Federal Correctional Institution Victorville Medium II ("FCI Victorville"), a violent and understaffed medium-security federal prison in San Bernardino County.

Since June 2018, as part of its "Zero Tolerance Policy," the federal government has imprisoned thousands of asylum seekers and other immigrants in five federal prisons in the Western United States, including the FCI Victorville. The consequences of Defendants' decision to incarcerate immigrants in this federal penitentiary are both predictable and devastating. ICE detainees at the prison live in degrading and punitive conditions. They wear brown and orange jumpsuits and are caged in locked cells for extended periods. They endure strip searching and shackling. They are denied ready access to fresh air and sunlight and to adequate food and nutrition. Even though many of these individuals entered the country to seek asylum, they live day in and day out in harsh prison conditions, with no idea when they will be released or where they will go next.

Many of these individuals are fleeing trauma and violence in their home countries, yet Defendants fail to provide adequate psychological screening or mental health treatment. Defendants also fail to provide detainees with adequate access to medical care, even for urgent medical conditions. Nor do they provide language interpretation when medical encounters do occur. Custody officers routinely retaliate against detainees for seeking medical care and threaten to withhold privileges if detainees request medical attention. As a consequence of these failures, an atmosphere of desperation and fear pervades the prison.

---

[2] Plaintiffs filed a Motion for Class Certification on September 4, 2018 (Doc. 34).

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

As if these conditions were not appalling enough, Defendants have deprived detainees of the ability to freely practice their religion—one of the few things that might bring them some sense of comfort or peace of mind. Detainees are denied the right to participate in congregate worship services and group prayer is restricted. They are unable to obtain religious counseling or consult with clergy. Detainees' ability to read and study holy texts, as well as their ability to wear religious headgear and jewelry, are limited by Defendants' confiscation of their personal religious items and refusal to return or replace them in a timely manner, or at all.

Plaintiffs will move for expedited discovery in order to fully examine and document the conditions of confinement for ICE detainees at FCI Victorville. Even without benefit of discovery, however, it is evident that these conditions of confinement fall below constitutional minima. Defendants' denial of adequate health care and employment of unnecessarily punitive and harmful custodial practices violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Defendants also violate the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. by restricting and failing to accommodate detainees' religious exercise. Although the named plaintiffs in this action have been transferred out of FCI Victorville since the filing of the complaint, the conditions of confinement imposed by Defendants continue to cause irreparable harm to the class, as well as the subclass, they seek to represent. The balance of hardships tips sharply in the Plaintiffs' favor, and the public has no interest in subjecting immigrants to punitive and degrading conditions of confinement or in denying them the ability to practice their religion.

Pursuant to Federal Rule of Civil Procedure 65, the Court should enjoin Defendants from the unlawful and unnecessary policies and practices that threaten the physical, mental, and spiritual well-being of detainees at FCI Victorville. In particular, the Court should enjoin Defendants from providing constitutionally

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

inadequate health care to ICE detainees at FCI Victorville, subjecting ICE detainees at FCI Victorville to conditions and practices that amount to punishment, restricting detainees' religious exercise or failing to accommodate detainees' religious exercise in a manner that violates or is otherwise inconsistent with ICE's Detention Standards, and transferring any additional ICE detainees to FCI Victorville.

## II.   BACKGROUND

### A.   The Conditions for ICE Detainees at FCI Victorville Are Similar to, or Worse than, Those of Criminal Prisoners

Defendants know that prisons are inappropriate facilities for immigration detainees. In 2009, ICE concluded that "the demeanor of the Immigration Detention population is distinct from the Criminal Incarceration population." Specifically, "the majority of the population is motivated by the desire for repatriation or relief, and exercise exceptional restraint" so that "relatively few file grievances, fights are infrequent, and assaults on staff are even rarer."[3] ICE identified "important distinctions" between "the administrative purpose" of immigration detention, "which is to hold, process, and prepare individuals for removal—as compared to the punitive purpose of the Criminal Incarceration system."[4] Notwithstanding these critical distinctions, ICE has elected to incarcerate immigration detainees in a federal prison, a facility designed to punish the persons incarcerated there.

Both in policy and practice, the federal government flouts the distinction between civil and criminal detention for the ICE detainees at FCI Victorville. The ICE-BOP Inter-Agency Agreement that governs the incarceration of ICE detainees at FCI Victorville expressly provides that the detainees will be subject to BOP's policies for *pretrial criminal* inmates. *See* Doc. 35-1 at ¶ 4.D.3.a; *see also* Program

---

[3] Dora Schriro, U.S. Department of Homeland Security, *Immigration Detention Overview and Recommendations* at 2, 21 (Oct. 6, 2009).

[4] *Id.*

Statement 7331.04, Federal Bureau of Prisons (hereinafter "BOP PS"), 1 (Jan. 31, 2003).[5] With respect to medical care, mental health care and discipline, BOP policy regards ICE detainees as indistinguishable from criminal prisoners at FCI Victorville. *See id.* at 1, 14, 16.

Indeed, ICE detainees at FCI Victorville experience the same custodial restrictions as criminal prisoners.[6] ICE detainees, like criminal prisoners, are subject to unclothed visual inspections. *See, e.g.,* Decl. of Yoni Santiago Gutierrez, attached hereto as Exhibit 1 at ¶ 3 ("When we arrived . . . [w]e had to take off all of our clothes and be searched. I also have been strip searched two other times after legal visits."); Decl. of Noel Siles, attached hereto as Exhibit 2 at ¶ 4 ("When I first got here, I was strip searched. I had never exposed myself like that and I felt it was a huge violation. I was told to hold my hands behind my head and turn around and show my buttocks to an officer and cough.").[7] ICE detainees, like criminal prisoners, are shackled—sometimes for hours on end—when they are transported to

_____

[5] BOP Program Statements are available at
https://www.bop.gov/resources/policy_and_forms.jsp.

[6] Detainees have been told by prison officers that, although immigration detainees are not prisoners, they are in prison and have to follow federal prison rules *see* Decl. of Gabriel Manzanilla Pedron, attached hereto as Exhibit 3, at ¶ 17, and that these rules are stricter than rules in jails. *See* Doc. 1-1 at ¶ 17.

[7] *See also* Doc. 1-6 at ¶ 7 ("I had to take off all of my clothes in front of an official before I was given a brown jumpsuit."); Decl. of Desmond Tenghe, attached hereto as Exhibit 4, at ¶ 3 ("We were strip searched when we arrived. It was embarrassing. I have also been strip searched after a legal visit."); Supp. Decl. of Stephenson Awah Teneng, attached hereto as Exhibit 5, at ¶ 16 (unclothed visual search upon arrival at Victorville); Decl. of Alex Armando Villalobos Veliz, attached hereto as Exhibit 6, at ¶ 5 (same). BOP conducts these searches despite its Pretrial Inmate policy prohibiting visual searches without reasonable suspicion that an inmate is concealing a weapon or contraband. *See* BOP PS 7331.04, 1, 6 (Jan. 31, 2003).

5:18-CV-01609

1  or from FCI Victorville.[8] ICE detainees, like criminal prisoners, are also subjected

2  to extended lockdowns that restrict them to locked cells for days.[9] ICE detainees,

3  like criminal prisoners, are required to stand for inmate count and follow the rules of

4  the prison.[10] ICE detainees, like criminal prisoners, have severely restricted access

5  to fresh air and opportunities for socialization.[11]

6      In many regards, conditions for ICE detainees at FCI Victorville fall well

7  below the standards that Defendant BOP sets for criminal prisoners. For example,

8  BOP policies require that criminal prisoners receive adequate nutrition and at least

9  20 minutes to eat their meals.[12] ICE detainees, by contrast, receive meals that are

10  small, inadequate, of poor nutritional value, and inedible.[13] Officers allow less than

---

12  [8] *See, e.g.,* Doc. 1-6 at ¶ 5 (Plaintiff shackled for four to five hours); Exhibit 6
13  (attached hereto) at ¶ 4 (shackled for five to six hours), Exhibit 4 (attached hereto) at
14  ¶ 2 (shackled for three hours), Doc. 1-3 at ¶¶ 7-8 (shackled and chained during trip
   to hospital for urgent medical care).

15  [9] *See, e.g.,* Doc. 1-5 at ¶ 7 (plaintiff kept in cell for first few days after he arrived in
16  July); Doc. 1-8 at ¶ 16 (locked down "for about four days without clean clothes or
   showers"); Doc. 1-11 at ¶ 3 (constantly locked in cell the first three days after he
17  arrived); Doc. 1-17 at ¶ 7 (spent the first three or four days locked in his cell). *See
18  also* Exhibit 3 (attached hereto) at ¶ 14; Exhibit 6 (attached hereto) at ¶ 7.

19  [10] *See, e.g.,* Exhibit 3 (attached hereto) at ¶ 18 (officer informed detainee "that we
   are in a prison and we have to follow prison rules"); *id.* ("I saw a guard threaten to
20  hit somebody because he did not get up fast enough at 9:30" for count).

21  [11] *See, e.g.,* Doc. 1-6 at ¶ 14 (plaintiff's unit locked down for seven hours due to a
   fight in another building); Doc. 1-9 at ¶ 6 (extremely limited out of cell time); Doc.
22  1-10 at ¶ 15 (same); Doc. 1-11 at ¶ 3 (24-hour lockdowns on weekends); Doc. 1-19
23  at ¶ 12 (same). *See also* Exhibit 5 (attached hereto) at ¶ 17; Exhibit 6 (attached
   hereto) at ¶ 9.

24  [12] BOP PS P4700.06, 1, 61 (Sept. 13, 2011) (requiring nutritionally adequate meals
25  and dining spaces that afford "each inmate the opportunity to have at least 20
26  minutes of dining time for each meal").

27  [13] *See* Doc. 1-8 at ¶¶ 15, 17 (weight loss due to lack of food; often served sour milk);
   Doc. 1-9 at ¶ 10 (inadequate amount of food, has seen worms or maggots in the
28  (footnote continued)

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES

five minutes for the detainees to eat their meals before demanding that they leave the chow hall and throw away any uneaten food.[14]

BOP policies also require that all institutions offer various continuing education, library, parenting, and other programs.[15] No such programs are provided for ICE detainees, who cannot even access books in languages they understand.[16]

Similarly, BOP policy requires that criminal prisoners "have access to regularly scheduled congregate services [and] chaplains" and outlines various other religious programs, services, and accommodations available to criminal prisoners.[17] However, Defendants have not provided meaningful access to religious worship

_____

meat); Doc. 1-10 at ¶ 8 (inadequate amount of food, meat in the sandwiches is sometimes expired); Doc. 1-14 at ¶ 11 (inadequate amount of food); Doc. 1-15 at ¶ 21 (inadequate amount of food; sometimes served spoiled milk and sandwiches that are just two pieces of bread); Doc. 1-20 at ¶ 5 (inadequate amount of food; often feels hungry); Doc. 1-4 at ¶ 11 (7 kilograms lost due to inadequate food).

[14] *See* Doc. 1-6 at ¶¶ 20, 21 (less than 10 minutes to eat; official forced a detainee to throw away bread he had put in his pocket when leaving the chow hall); Doc. 1-7 at ¶ 6 (only 5 minutes to eat); Doc. 1-8 at ¶ 15 (only about 5 minutes to eat; not allowed to take food from the chow hall, even an apple); Doc. 1-10 at ¶ 8 (only 3-5 minutes to eat); Doc. 1-17 at ¶¶ 12 (3-4 minutes to eat each meal; leftover food is confiscated and thrown away); Doc. 1-20 at ¶ 5 (only 5 minutes to eat).

[15] BOP PS 5300.21 (Feb. 18, 2002); *see also* BOP PS P5370.11, 1 (June 25, 2008) (BOP "encourages inmates to make constructive use of leisure time, and offers movies, games, sports, social activities, arts and hobbycrafts, wellness, and other group and individual activities").

[16] Doc. 1-2 at ¶ 8 (told by ICE that he could not participate in classes listed on a paper about the prison); Doc. 1-4 at ¶ 7 (only English books available); Doc. 1-9 at ¶ 9 (no programs, education, or training available); Doc. 1-10 at ¶ 7 (no activities, programs, jobs; books are only in English); Doc. 1-14 at ¶14 (books only in English, no classes or programs); Doc. 1-15 at ¶¶ 14, 19 (no classes, programs, or groups available); Doc. 1-17 at ¶ 15 (no known educational, recreational, or other programs); Exhibit 5 at ¶ 14 (no access to school or other activities).

[17] BOP PS P5360.09, 1, 1 (Dec. 31, 2004).

services for detainees, and their ability to engage in informal congregate prayer and religious study is limited. *See infra* II.D.

Finally, BOP policies governing patient care provide that criminal prisoners receive physical and mental health assessments upon intake. The policies require that medical staff assess patients when they express pain. They require that patients have access to a variety of physical and mental health care services and treatments while incarcerated.[18] In practice, as detailed herein, Defendants routinely deny or delay the provision of these health care services to ICE detainees at FCI Victorville.

Indeed, Defendants confine ICE detainees in conditions far more restrictive than those to which Defendant BOP subjects convicted criminal prisoners in even its minimum-security facilities. For example, according to BOP, minimum-security facilities (also known as federal prison camps) "have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing. These institutions are work- and program-oriented."[19] Many of the housing units in federal prison camps provide open access to microwave ovens, clothing irons, hairdryers, curling irons, and other appliances.[20] Some individuals in BOP camps are permitted to possess a radio or MP3 player,[21] sleep in residential dorm-like buildings, and access gyms and

---

[18] BOP PS 6031.04, 1, 20 (June 3, 2014) ("patients who complain of pain, will be assessed and treated if necessary"); *id*. at 5 (listing categories of medical treatment available); *id*. at 23 (initial assessment to be conducted upon arrival at institution).

[19] *About Our Facilities*, Federal Bureau of Prisons*, available at* https://www.bop.gov/about/facilities/federal_prisons.jsp.

[20] *FPC Alderson Inmate Handbook,* Federal Bureau of Prisons, 1, 8 (June 2012), https://www.bop.gov/locations/institutions/ald/ALD_aohandbook.pdf; *FPC Duluth Inmate Admissions and Orientation Handbook,* Federal Bureau of Prisons 1, 12 (Feb. 2010), https://www.bop.gov/locations/institutions/dth/DTH_aohandbook.pdf.

[21] *FPC Bryan Inmate Admission and Orientation*, Federal Bureau of Prisons, 1, 7 (Jan. 22, 2016), *available at* https://www.bop.gov/locations/institutions/bry/BRY_aohandbook.pdf.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

movie theaters.[22]

By contrast, Defendants confine ICE detainees at FCI Victorville in small, locked cells. Defendants restrict their freedom of movement, and even keep detainees locked in their cells on Saturdays and Sundays, while prisoners are allowed out of their cells on the weekends. *See* Exhibit 6 (attached hereto) at ¶¶ 9-10. Defendants confiscate detainees' personal property and prohibit them from possessing entertainment devices like televisions and radios to help pass the time. *See* Doc. 1-15 at ¶ 13 (housed alone in small cell), and at ¶14 (no television or radio in cell); Exhibit 5 (attached hereto) at ¶ 13 (prisoners are permitted to have MP3 players, but ICE detainees are not). Defendants deny ICE detainees access to educational and recreational programs and work opportunities.

**B.    Defendants' Practices and Conditions of Confinement at FCI Victorville Violate ICE's Detention Standards**

The government has developed standards for ICE detention that expressly prohibit many of the practices and conditions of confinement present at FCI Victorville.[23] ICE's 2008 and 2011 Performance-Based National Detention Standards ("PBNDS") require, for example: (1) physical and mental health intake assessments; (2) access to appropriate health care services; (3) provision of adequate nutrition, and at least 20 minutes to eat meals; and (4) access to religious worship services, clergy, and various religious items.[24] The fact that Defendant ICE

_____

[22] Esme Murphy, *Behind Bars: Denny Hecker's Life in Prison*, CBS Minnesota (May 15, 2011) (describing the Federal Prison Camp in Duluth, Minnesota).

[23] ICE's Performance-Based National Detention Standards ("PBNDS") govern conditions in eleven immigration detention centers in the Ninth Circuit. *See* U.S. Customs and Immigration Enforcement, Facility Inspections: Dedicated and Non-Dedicated Facility List, https://www.ice.gov/facility-inspections.

[24] PBNDS 2008 § 4.22(V)(I)(1); PBNDS 2011 § 4.3(II)(14) (intake assessments); §§ 4.22(II)(15), 4.22(V)(B), (K), (N) & (O); PBNDS 2011 §§ 4.3(II)(2) & (4), 4.3(V)(A), (S) & (T) (health care services); PBNDS 2008 §§ 4.20(II)(1), (3) & (4), (footnote continued)

8                                                          5:18-CV-01609

developed and enforces these standards for ICE detainees demonstrates that the deprivations at Victorville are not necessary to achieve a governmental objective.[25]

### C.   Defendants Deny Minimally Adequate Health Care to ICE Detainees at FCI Victorville.

In addition to subjecting ICE detainees to harmful and punitive conditions of confinement at FCI Victorville, Defendants fail to provide for detainees' basic medical and mental health needs. The prison lacks adequate health care staff to provide a minimally adequate system of health care for individuals detained there. On August 27, 2018, John Kostelnik, a case manager at FCI Victorville and president of AFGE 3969, which represents BOP employees at FCI Victorville, confirmed that there are just two doctors on staff to serve over 4,000 criminal prisoners and ICE detainees at FCI Victorville, and one of them is largely occupied with administrative tasks. *See* Decl. of Margot Mendelson ("Mendelson Decl."), Exhibit 1, at p. 1, ln. 25, p. 2, ln. 1.[26] According to media reports, no additional staff were hired to help attend to the 1,000 detainees that arrived around June 8, and "[m]edical staff have become 'emotional' as they struggle to provide proper care" for Victorville's thousands of charges.[27] Mr. Kostelnik's account is consistent with

---

4.20(V)(D)(1); PBNDS 2011 §§ 4.1(II)(1) & (3), 4.1(V)(D)(1) (adequate nutrition and time to consume meals); §§ 5.30(II)(6), 5.30(V)(G); PBNDS 2011 §§ 5.5(V)(D), (F) & (J). The 2008 and 2011 PBNDS standards are available at https://www.ice.gov/factsheets/facilities-pbnds.

[25] Plaintiffs do not concede that the ICE standards meet constitutional minima; many are unduly restrictive. Nonetheless, even these excessively restrictive standards provide for less punitive correctional practices and conditions of confinement than those that exist at FCI Victorville.

[26] *Accord* Lauren Gill, *As Immigrant Detainees Are Moved to Prisons, What Happens to the Prisoners?,* Rolling Stone (July 3, 2018) (documents show that "there are just two physicians, nine physician assistants or nurse practitioners, and one medical clerical worker to care for the roughly 4,200 people" at FCI Victorville).

[27] Lauren Weber, *As Health Conditions Worsen at Prison Holding 1,000* (footnote continued)

---

the U.S. Department of Justice Office of the Inspector General's 2016 investigative findings, which documented systemic understaffing of medical professionals throughout the BOP, resulting in limitations on prisoners' access to medical care.[28] These deficiencies in medical staffing have led to a dangerous and life-threatening situation for ICE detainees at the prison, whose health care needs have been ignored.

### 1. Defendants Fail to Provide Adequate Intake Health Screening.

Defendants fail to conduct adequate intake health screenings of detainees when they are admitted to FCI Victorville. There is no consistent screening of detainees for medical, mental health, or dental problems upon intake. *See* Doc. 1-10 at ¶ 12 (no dental screening despite painful toothache); Doc. 1-15 at ¶ 5 (no medical, dental, or mental health screening upon arrival). The minimal and inconsistent screening that does occur often involves no meaningful communication with the patient, leading to "treatment" without detainees' informed consent. *See* Doc. 1-6 at ¶ 15 ("They didn't tell us what was in the injection"); Doc. 1-2 at ¶ 13 ("screening" consisted of an injection of unknown contents).

Indeed, communication is, in many cases, rendered impossible by Defendants' failure to provide language interpretation to detainees. For example, a nurse who examined Plaintiff Ankush Kumar regarding his kidney stones relied on another Punjabi-speaking detainee who is fluent in English and was compelled to interpret for other Punjabi speakers during medical encounters. Doc. 1-3 at ¶ 6.

---

*Detainees, Staff Fears A Riot,* Huffington Post (July 2, 2018); Gill, *supra* note 26.

[28] U.S. Dep't of Justice, Office of Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges,* (March 2016). Plaintiffs have requested discovery regarding staffing and vacancy levels for custody and health care staff at FCI Victorville. *See* Plaintiffs' Motion for Expedited Discovery, filed herewith. Plaintiffs will supplement this filing once that discovery is obtained.

Plaintiff Ngwa is fluent in English and French, and acted as a translator for French-speaking detainees. Doc. 1-2 at ¶ 16; *see also* Doc. 1-7 at ¶ 4 (detainee relies on cellmate to translate to French); Doc. 1-9 at ¶ 16 (another detainee translated when he saw a nurse regarding stomach pain). Some non-English speaking detainees are treated without any interpretation at all. *See* Doc. 1-17 at ¶ 8 (received medical treatment he did not understand; all services rendered in English).

These nonexistent or inadequate screenings have predictably had adverse health effects on the detainee community at large, including outbreaks of communicable diseases and prolonged quarantines.[29] According to Mr. Kostelnik's August 27, 2018 report, in fact, there have been at least 60 cases of scabies and 30 cases of chickenpox at the prison since the ICE detainees arrived in June 2018. *See* Exhibit 1 to Mendelson Decl., at p. 2, ln. 5-10.

At FCI Victorville, Defendants have relied on a short, written survey (available only in English and Spanish) for mental health screening. *See* Doc. 1-19 at ¶ 6 (describing questionnaire used in lieu of mental health screening).[30] Plaintiff Granados Aquino was "never . . . asked about [his] mental health in person" after arriving at FCI Victorville. Doc. 1-6 at ¶ 15. When he first arrived at the prison, he

---

[29] *See* Roxana Kopetman, *Immigration detainees in Victorville prison get more scabies, chicken pox; protesters to gather Saturday*, The Orange County Register (June 29, 2018).

[30] On August 10, 2018, U.S. District Judge Dolly M. Gee issued an order in the *Franco-Gonzalez v. Nielsen* litigation finding that the initial mental health screenings conducted for ICE detainees at some federal prisons, including FCI Victorville, are "inadequate" and fail to meet the requirements of the injunction and implementation plan in that case. Order, *Franco-Gonzalez v. Nielson*, Case No. 2:10-cv-02211-DMG-DTB, Doc. 1008 at 7, 11 (C.D. Cal. Aug. 10, 2018). On August 17, 2018, the U.S. Department of Justice filed a status report representing that ICE and BOP would "work together to . . . perform . . . 14-day mental health re-screenings" to the 441 ICE detainees at FCI Victorville II by August 31, 2018. *See* Defs.' Status Report, *Franco-Gonzalez v. Nielsen*, Doc. 1009 at 2.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

filled out a form, on which he indicated that he was depressed; however, Defendants never followed up to conduct an assessment or offer him mental health services. *Id.* at ¶ 16. This is consistent with the experiences of other Plaintiffs and detainees. *See* Doc. 1-2 at ¶ 15 ("No one has asked me if I feel sad, depressed, or suicide [*sic*]. I would tell them [yes] if they did."); Doc. 1-18 at ¶¶ 4-5, 7 (no screening or ability to request counseling for anxiety because staff does not speak French); Doc. 1-19 at ¶ 6 (no face-to-face mental health screening).

### 2. Defendants Do Not Provide Emergency and Routine Health Care.

Plaintiffs and other detainees at FCI Victorville have experienced medical emergencies that go unaddressed and result in gratuitous suffering and a risk of permanent injury or death. While there is an emergency call button in each cell, calls from detainees experiencing medical emergencies are often ignored. When he experienced extreme pain from a kidney stone, for example, Plaintiff Kumar pushed the emergency call button but was not provided medical attention until the next day, when he was given medication and ultimately transported to the hospital. Doc. 1-3 at ¶ 5-7. In some cases, detainees have been instructed not to use the emergency call button to notify staff of their health care needs. Prison staff instructed a detainee that he "should not touch the call button in [his] cell unless [he is] dying," Doc. 1-15 at ¶ 24, and told another detainee never to push the button again. Doc. 1-11 at ¶¶ 7-8.

Defendants also lack a reliable system for detainees to access routine health care. Detainees struggle to communicate their medical care needs to health care staff. For example, forms to request access to medical services are not routinely available, and in those cases where forms are provided, they are available only in English and Spanish. *See* Doc. 1-2 at ¶ 11-12; Doc. 1-4 at ¶ 4; Doc. 1-9 at ¶ 15; Doc. 1-10 at ¶ 11; Doc. 1-11 at ¶ 6. Even those suffering severe and ongoing pain are unable to convey their needs to medical staff. *See* Doc. 1-10 at ¶¶ 10-13 (detainee unable to request medical care for his toothache); Doc. 1-20 at ¶ 7 (describing

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

detainee who requested medical care for toothache for eight days "but no one came to see him").

When detainees do manage to access medical staff, diagnosis and treatment is often delayed or denied outright. In one case, a detainee who was suffering from a fever, cough, and sore throat was told by staff that there "weren't any medical consultations unless it was really serious, so [he] could not have any help." Doc. 1-19 at ¶¶ 7–9. *See also* Doc. 1-2 at ¶ 13 (medical staff screening detainee for chicken pox "did not want to talk to me about my pain"); Doc. 1-1 at ¶¶ 7-13; and at ¶¶ 19-21 (no dental treatment or medication for Plaintiff Teneng's severe toothache despite complaining to custody and medical staff multiple times over multiple days); Doc. 1-11 at ¶¶ 7-8 (told to wait until "mañana" for treatment for gastritis); Doc. 1-9 at ¶ 3, and at ¶¶ 13-16 (detainee unable to request medical services or to communicate with officers about bloody stool, peeling skin, and rashes for weeks); Doc. 1-18 at ¶ 6 (detainee requested X-ray due to pain in his shoulders, ribs, and leg, but was not provided an exam.); Doc. 1-8 at ¶ 13 (detainee with nosebleed denied access to medical staff, and instead told to "deal with it and cut out your bullshit").

### 3.      Defendants Do Not Provide Minimally Adequate Mental Health Care.

Defendants fail to provide adequate meaningful mental health treatment, even when detainees inform Defendants of serious, current mental health needs. Doc. 1-6 at ¶¶ 11, 15-16 (in response to urgent request for mental health treatment, officer told detainee "I can't help you right now. Maybe tomorrow."); Doc. 1-15 at ¶¶ 16, 25 (detainee experiencing depression, loneliness, and desperation; unable to access mental health services); Doc. 1-18 at ¶ 7 (detainee deeply anxious and unable to access mental health services). One detainee learned, while in custody at FCI Victorville, that his father had been killed in Honduras. Exhibit 1 (attached hereto) at ¶ 5. Upon learning the news, he "yelled and began to cry and lost control." *Id.* In response, "some guards started laughing at me" and "put me in a little hallway all

alone." *Id.* at ¶¶ 6-7. After an hour and a half, a psychologist arrived, but she didn't speak Spanish and relied on another detainee to translate. *Id.* at ¶ 8. A few days later, another mental health professional came to see him in the hallway of the housing unit, "in front of all of my acquaintances." *Id*. at ¶ 13. She also didn't speak Spanish, and relied on another detainee to translate. *Id*. She told the man that "if I keep asking for the psychologist, they were going to put me in isolation." *Id*.

Defendants' failure to provide mental health care at the prison is particularly problematic because the harsh and punitive conditions of confinement can cause severe psychological distress. Detainees at FCI Victorville report experiencing mounting depression and hopelessness, which is exacerbated by long periods of enforced idleness and the denial of adequate opportunities for recreation, activity, and socialization.[31] They also report that they hear men weeping in their beds at night and that they have seen men with fresh scars on their wrists from cutting themselves.[32] Media reports indicate that at least two detainees have attempted

---

[31] *See* Doc. 1-2 at ¶ 10 (depression and difficulty sleeping due to enforced idleness); Doc. 1-6 at ¶ 11 (cried in cell and became depressed due to isolation); Doc. 1-9 at ¶ 12 (anxiety due to being locked in cell 20-21 hours a day with nothing to do); Doc. 1-10 at ¶ 10 ("As a result of spending so much time in my cell with nothing to do, I am frustrated, worry, and get headaches"); Doc. 1-13 at ¶ 3 ("When we first arrived at Victorville we were in our cells all of the time and it was very hard."); Doc. 1-15, at ¶ 16 ("I am having a very difficult time with the isolation and idleness. I feel very depressed and lonely. At night, I cry."); Doc. 1-18 at ¶ 3 (anxiety and difficulty sleeping due to being locked in cell with nothing to do); Exhibit 2 (attached hereto) at ¶ 5 (depression has worsened due to the conditions; has suicidal thoughts).

[32] Doc. 1-8 at ¶ 14 ("I saw an Ecuadorean man who took the blade out of his razor and cut across his arms and cut a cross into the side of his wrist."); Doc. 1-15 at ¶¶ 17-18 (has heard men crying in their beds at night; has seen men with scars from cutting themselves due to depression and desperation); Exhibit 5 (attached hereto) at ¶ 20 (heard a fellow detainee crying in his cell during quarantine); Exhibit 3 (attached hereto) at ¶ 9 (heard detainees crying, threatening suicide).

1  suicide or been placed on suicide watch.[33] By failing to provide adequate mental

2  health care, Defendants have placed Plaintiffs and the class they seek to represent at

3  serious risk of needless psychological harm, injury, and death by suicide.

### 4.  Defendants Do Not Provide Adequate Medication.

5  Defendants also have failed to ensure that detainees receive necessary

6  medications. In one case, an asthmatic patient was denied an inhaler or other asthma

7  medicine upon arrival at FCI Victorville, despite informing staff of his condition.

8  *See* Doc. 1-15 at ¶¶ 3, 5. He suffered an asthma attack a week later and when he was

9  finally given an inhaler, it only had 15 doses left. *Id.* at ¶¶ 6-7. Once that inhaler ran

10  out, the detainee requested another but staff did not provide one. *Id.* at ¶¶ 7-8.

11  Another detainee, whose medication was thrown away by ICE officials when

12  he was apprehended, notified prison staff of his medical need when he arrived at

13  FCI Victorville but was denied because he could not remember the name of the

14  medicine. Doc. 1-8 at ¶¶ 7, 10. Medical staff did not attempt to determine his

15  diagnosis or provide an alternative medication. *Id.* at ¶ 11. A third detainee who was

16  seriously injured and hospitalized during his initial apprehension was not given any

17  pain medication following his initial treatment. *See* Doc. 1-20 at ¶ 2. Nor was he

18  provided instructions for refilling his gastritis medication. *Id.* at ¶¶ 8-9. The same is

19  true of another detainee suffering from gastritis, despite making multiple requests.

20  Doc. 1-7 at ¶¶ 7-12. Another detainee has been unable to obtain medicine for a

21  serious skin rash, causing his skin to peel. Doc. 1-9 at ¶ 13.

---

23  [33] *See* Lauren Weber, *Detainee Attempts Suicide After Trump Administration
24  Jams Migrants Into Troubled Prison*, Huffington Post (Aug. 1, 2018) ("In the
last week, one detainee has tried to kill himself, saying he was terrified he would be
25  deported back to Cuba. Another was put on suicide watch after staffers noticed he
couldn't stop crying . . . ."). *Cf.* Weber, *supra* n.27 (Congressman who toured
26  Victorville expressing concern that "the sense of hopelessness and depression could
27  cause some of them to take their own lives").

**5.    Custody Staff Use Threats and Retaliation to Improperly Interfere with Health Care.**

Custody staff at FCI Victorville routinely interfere with detainees' access to health care with conduct that is perceived as retaliatory and has had a chilling effect on detainees' willingness to report alarming symptoms or request health care. For example, Plaintiff Teneng was "locked in his cell for several hours while other detainees were allowed out in response to his asking medical staff to care for his tooth pain." Doc. 1-1 at ¶¶ 13-18. *See* Doc. 1-13 at ¶ 3 (detainee was afraid to ask for medical care because of how custody staff respond to others who request care); Exhibit 3 (attached hereto) at ¶¶ 11-12 (same). Detainees have been intimidated into silence either through explicit threats or verbal abuse. Doc. 1-1 at ¶ 17 (Plaintiff threatened with pepper spray if he continued to complain about his toothache); Doc. 1-11 at ¶¶ 7-8 (custody staff response to request for medical care was "don't be a dumbass"); Doc. 1-8 at ¶ 13 (custody staff response to request for medical treatment was "deal with it and cut out your bullshit"); Doc. 1-15 at ¶ 24 (detainee warned he "should not touch the call button in [his] cell unless [he is] dying").[34]

**D.    Defendants Have Severely Limited Detainees' Religious Exercise.**

FCI Victorville detainees' ability to exercise their religion is severely limited. For example, detainees are not permitted to attend religious worship services that may be held for other prisoners at the facility. *See, e.g.*, Doc. 1-2 at ¶ 9 (Plaintiff reporting no Presbyterian worship services); Doc. 1-7 at ¶ 13 (Catholic); Doc. 1-12 at ¶ 7 (Sikh); Doc. 1-14 at ¶ 12 (Hindu); Doc. 1-18 at ¶ 2 (Islamic); Decl. of Dominic Tebit, attached hereto as Exhibit 7, at ¶ 8 (Presbyterian); Exhibit 3 at ¶ 21 (Seventh Day Adventist not allowed to attend any religious services); Decl. of Fabio

---

[34] The conditions at issue here do not comply with the ICE standards providing that "[b]ecause ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care." PBNDS 2011 at i.

Serrano Solorzano, attached hereto as Exhibit 8, at ¶ 16 (Catholic); *see also* Doc. 1-9 at ¶ 9; Doc. 1-16 at ¶ 8.

Detainees' ability to gather informally outside of their cells to conduct group prayer or religious study is also limited. *See* Doc. 1-6 at ¶ 23 (officers told Plaintiff and other detainees that they could not gather in the day room to pray, sing songs, and preach); Doc. 1-9 at ¶ 9 (officers told detainees who sought to pray in common area they "did not have the right to assemble or to pray together"); Doc. 1-18 at ¶ 2 (Muslim detainee can only pray in his cell); Exhibit 3 at ¶ 22 (officer broke up detainees' Bible study and told them it was not allowed"); Exhibit 8 at ¶ 16 (detainees trying to pray and sing hymns told they could not gather as a group).

Further, detainees of faith have no ability to consult with clergy or obtain religious counseling. *See, e.g.*, Doc. 1-2 at ¶ 9 (Presbyterian Plaintiff not able to see clergy); Doc. 1-7 at ¶ 13 (detainee unable to see a priest since being detained at FCI Victorville); Exhibit 7 at ¶ 16 (Catholic detainee has no access to pastor or priest).

Defendants also have restricted detainees' access to various religious items, including holy books and other religious texts, religious headwear, and religious jewelry. For example, Plaintiff Granados Aquino's Bible was seized at the border, and Defendants denied his request for its return. Doc. 1-6 at ¶ 25. Another detainee—a Seventh Day Adventist for whom reading the Bible in Spanish is an "important part" of his religious practice—also had his Spanish-language Bible confiscated by Defendants, who have refused to return it. Exhibit 3 at ¶ 23. Fifteen detainees on his unit are forced to share three Bibles. *Id*.; *see* Doc. 1-15 at ¶15 (detainee made "multiple requests for a Bible but officers in [his] housing unit said there are no bibles here"). Similarly, Muslim detainees have no access to the Quran or other Islamic texts. Doc. 1-18 at ¶ 2.

One detainee reported that his rosary was confiscated at the border, and he has no idea where it is. Doc. 1-20 at ¶ 10. An ICE officer told him it was in

Florence; another officer said his property had been lost. *Id.* Sikh detainees' turbans and karas (religious bracelets) have been confiscated as well. Defendants have not returned them. *See, e.g.*, Doc. 1-4 at ¶ 9 (Plaintiff Atinder Paul Singh "asked repeatedly if I could get my turban back, or wear a head covering" but "was told it is not allowed); Doc. 1-5 at ¶ 6 ("Since I came to Victorville, I have asked for a turban and my kara but was told they are in my personal property."); Doc. 1-12 at ¶¶ 5, 8 (Sikh turban confiscated, never returned).

The prison has purported to make turbans available to purchase via the commissary. *See* Doc. 1-4 at ¶ 10. However, in practice, many detainees continue to suffer serious delays in obtaining a turban, if they receive one all.[35] The commissary is only open on Mondays, and even then, commissary hours are often canceled without notice. Decl. of Munmeeth Kaur Soni, attached hereto as Exhibit 9, at ¶ 10. As a result, newly arriving detainees who need turbans are forced to go a week or more without commissary access. *Id.* Moreover, many detainees cannot afford to purchase turbans. *See id.* at ¶ 11; Doc 1-4 at ¶ 10.

## III.   ARGUMENT

Plaintiffs are entitled to a preliminary injunction prohibiting the unconstitutional and punitive policies and practices in effect at FCI Victorville because: (1) Plaintiffs are likely to succeed on the merits; (2) Plaintiffs are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in Plaintiffs' favor, and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008). Plaintiffs also are entitled to preliminary relief under the "sliding scale" approach, the Ninth Circuit's "alternate formulation" of the

---

[35] According to Plaintiff Atinder Paul Singh, an ICE agent told detainees that they could obtain a "small cover like a patka," a type of turban, if they paid $10. Doc 1-4 at ¶ 10. But the patka was never received, even though Singh's prison account had enough money, thanks to his family in the United States. *Id.*

*Winter* standard. *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). Under this approach, as long as the *Winter* factors regarding irreparable harm and public interest are met, courts will issue an injunction where movants raise: (1) "serious questions going to the merits," and (2) the balance of equities "tips sharply towards the [movants]." *Id.* (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).[36]

### A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIFTH AMENDMENT CLAIM REGARDING EXCESSIVELY PUNITIVE CONDITIONS OF CONFINEMENT.

Immigration detainees are civil detainees, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), and "the government's discretion to incarcerate [them] is always constrained by the requirements of due process." *Hernandez v. Sessions*, 872 F.3d 976, 981, 1000-01 (9th Cir. 2017). The due process clause of the Fifth Amendment prohibits Defendants from confining ICE detainees in conditions that constitute punishment. *Jones v. Blanas*, 393 F.3d 918, 932, 934 (9th Cir. 2004) ("With respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal

---

[36] Plaintiffs seek a prohibitory injunction to "prevent future constitutional violations" of the class's and subclass's constitutional rights. *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (an injunction that "prevents future constitutional violations [is a] a classic form of prohibitory injunction"). Insofar as the relief sought could be characterized as requiring a mandatory injunction, however, Plaintiffs also meet this heightened standard. In the instant case, the merits of the case are not "doubtful," and the failure to issue an injunction will lead to "extreme or very serious damage" that will not be "capable of compensation in damages." *Id.* at 999 (citations omitted). As the Ninth Circuit recently held in a lawsuit challenging immigration detention practices, "unlawful detention certainly constitutes 'extreme or very serious' damage, and that damage is not compensable in damages." *Id.* at 999. Moreover, as in *Hernandez*, the merits of Plaintiffs' case "follow[] directly" from established precedent. *Id.*

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

detainees are held"); *see also Bell v. Wolfish*, 441 U.S. 520, 536 (1979) (for pretrial criminal detainees, the conditions and restrictions of detention cannot "amount to punishment").[37] Here, by design and in practice, the conditions of confinement for ICE detainees at FCI Victorville plainly amount to punishment.

Because the conditions for immigration detainees at FCI Victorville are presumptively unconstitutional, and because it is unlikely that Defendants will rebut this presumption, Plaintiffs are likely to succeed on the merits of their claim.

### 1. Incarcerating ICE Detainees at FCI Victorville Is Inherently Punitive.

Incarcerating ICE detainees at a medium-security federal prison is inherently punitive. Courts have recognized that the conditions of confinement in prisons are "designed to punish" criminals. *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982). At FCI Victorville in particular, the physical plant layout and correctional practices are designed to confine medium-security criminal prisoners in a manner appropriate to the heightened security threat they pose, within "strengthened perimeters (often double fences with electronic detention systems)," locked in "cell-type housing," and subjected to heightened "internal controls."[38] By incarcerating ICE detainees at FCI Victorville, Defendants subject them to a regime of punishment and control wholly inappropriate for civil detainees.

Exposing civil immigration detainees to punitive conditions of confinement is consistent with Defendants' broader policy of punishing immigrants who enter the country in an effort to deter future migrants. Indeed, Defendants have conceded that

---

[37] The Fifth Amendment due process clause applies here, but decisions construing the Fourteenth Amendment are instructive because the due process clauses of the Fifth and Fourteenth Amendments "are coextensive." *United States v. Navarro-Vargas*, 408 F.3d 1184, 1189 (9th Cir. 2005).

[38] *About Our Facilities, supra* n. 19 (prisons "operated at five different security levels in order to confine offenders in an appropriate manner.").

they began sending immigrants to FCI Victorville, in part, due to a spike in the demand for detention space resulting from their so-called "Zero Tolerance Policy" toward unauthorized border crossings.[39] In a recent filing before this court, the Department of Homeland Security argued that detaining immigrants is justifiable because it "deters others from unlawfully coming to the United States." *See* Defs.' Memorandum Of Points And Authorities In Support Of Ex Parte Application for Relief from the *Flores* Settlement Agreement, *Flores v. Sessions*, Case No. 2:85-cv-04544-DMG-AGR, Doc. 425-1 at 13 (C.D. Cal. June 21, 2018) (internal quotations and citation omitted). In essence, Defendants choose to lock Plaintiffs in a medium-security federal prison to send a message to foreign nationals that they will face a similar fate if they seek asylum or cross the border without authorization.

Courts have long held that general deterrence is an impermissible justification for any form of civil detention. *See, e.g.*, *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 373 (1997) (Kennedy, J., concurring)) (explaining that civil detention cannot be a "'mechanism for retribution or general deterrence' – functions properly those of criminal law"); *accord Hendricks*, 521 U.S. at 373 ("retribution and general deterrence are reserved for the criminal system alone"). A general-deterrence scheme is particularly objectionable in the immigration context because "neither those being detained nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate claims to asylum in this country." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 189 (D.D.C. 2015).

---

[39] *See, e.g.,* Kate Morrissey, *ICE is sending 1,000 immigrant detainees to Victorville prison*, San Diego Union-Tribune (Jun. 7, 2018) (ICE spokesperson said "the agency needed the extra bed space because of . . . the Department of Justice's recently implemented zero-tolerance policy on illegal crossings").

1
2

**2.    The Conditions at FCI Victorville Are Unconstitutional Because They Are Excessive in Relation to the Government Objective and Because Detainees Are Subjected to Similar, or Worse, Conditions Than Convicted Prisoners.**

3      As civil detainees, Plaintiffs and the class they seek to represent are entitled to

4  greater protections than post-conviction criminal detainees. *Jones*, 393 F.3d 918,

5  931-32 (9th Cir. 2004) ("an individual detained awaiting civil commitment

6  proceedings is entitled to protections at least as great as those afforded to a civilly

7  committed individual and at least as great as those afforded to an individual accused

8  but not convicted of a crime"); *see also Castro v. Cnty. of Los Angeles*, 833 F.3d

9  1060, 1069-70 (9th Cir. 2016) (recognizing distinction between the Eighth

10  Amendment protections afforded to persons with criminal convictions and the due

11  process protections afforded to pretrial detainees). Civil detainees are

12  constitutionally entitled to "more considerate treatment and conditions of

13  confinement" than criminal prisoners. *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th

14  Cir. 2000).

15      Conditions for civil detainees amount to punishment: "(1) where the

16  challenged restrictions are expressly intended to punish, or (2) where the challenged

17  restrictions serve an alternative, non-punitive purpose but are nonetheless 'excessive

18  in relation to the alternative purpose' . . . ." *Jones*, *supra,* 393 F.3d at 932 (internal

19  citations omitted). The court makes an objective assessment whether there is a

20  reasonable relationship between the government's conduct and a legitimate purpose.

21  *Unknown Parties v. Johnson*, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016),

22  *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017).

23      Moreover, if civil detainees are confined under conditions that are "identical

24  to, similar to, or more restrictive than" those of criminal prisoners, a presumption

25  arises that the conditions are punitive and thus unconstitutional. *King v. Cnty. of Los

26  Angeles*, 885 F.3d 548, 557 (9th Cir. 2018). A defendant can rebut the presumption

27  of unconstitutionality by showing "legitimate, non-punitive interests justifying the

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES

conditions of [the detainee's] confinement," and that the restrictions imposed are not "excessive in relation to these interests." *Id.* at 558 (quoting *Jones*, 393 F.3d at 933). However, "[e]ven if legitimate, non-punitive interests are identified, conditions of confinement may still be 'excessive' if they are 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.'" *Id.* (internal citations and quotation marks omitted).

The highly restrictive conditions of confinement at FCI Victorville are plainly excessive in relation to the government's interest. Here, the governmental objective is to detain immigration detainees pending their removal proceedings. [40] Defendants themselves have developed standards that prohibit many of the conditions present at FCI Victorville, including with respect to physical and mental health screenings, access to health care, nutrition, and exercise of religion. *See supra* II.A- D. Defendants have no legitimate governmental interest in conditions that violate their own minimum standards for conditions of confinement.

Moreover, Defendants confine ICE detainees at FCI Victorville in conditions similar to—and, in many respects worse than—criminal prisoners, and are therefore presumed to be punitive. *See Jones*, 393 F.3d at 934 ("a presumption of punitiveness arises" because plaintiff experienced "significant limitations on, or total denials" of access to recreation, religious services, phone calls, and visitation). As set forth above, *supra* II.A, ICE detainees are subject to the same BOP policies as criminal prisoners, including policies covering health care and discipline. Detainees are subject to many of the same correctional practices as criminal prisoners, such as extended lockdowns, unclothed visual searches, and shackling during transport. Detainees are, in fact, treated worse than criminal prisoners with respect to such

---

[40] "Congress has authorized immigration officials to detain some classes of aliens during the course of certain immigration proceedings." *Jennings v. Rodriguez*, -- U.S. --, 138 S. Ct. 830, 836 (2018).

crucial conditions of confinement as access to health care, nutrition, recreation and other programs, as well as the ability to exercise their religious beliefs.

Indeed, Defendants employ far more restrictive conditions and correctional practices toward ICE detainees at FCI Victorville than criminal prisoners at BOP minimum-security facilities. *See supra* II.A. Because the confinement conditions of ICE detainees at FCI Victorville are similar to, or worse than, the confinement conditions of criminal prisoners at FCI Victorville and at BOP's minimum-security facilities, they are presumptively punitive and unconstitutional.

Defendants are unlikely to rebut this presumption. To the extent Defendants claim that they shackle and strip search ICE detainees, restrict their access to fresh air and opportunities for socialization, deny them sufficient time to consume their food, provide them with inadequate mental health care and medical care, and severely limit their religious exercise in order to ensure their presence at their removal proceedings, the objective plainly "could be accomplished in so many alternative and less harsh methods." *King,* 885 F.3d at 558 (citations omitted). Defendants must pursue those alternative methods, even if doing so would create additional financial obligations: "Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing . . . [constitutional] violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc).

**B.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIFTH AMENDMENT CLAIM REGARDING DENIAL OF ADEQUATE HEALTH CARE.**

"There is no question that [ICE] detainees are entitled to 'adequate medical care.'" *Doe*, 878 F.3d 710 at 722 (citations omitted). The constitutional standard governing civil detainees' entitlement to adequate health care "differs significantly from the standard for convicted prisoners, who may be subject to punishment that does not violate the Eighth Amendment's ban on cruel and unusual punishment."

*Pierce v. Cnty. of Orange,* 526 F.3d 1190 (9th Cir. 2008), *opinion amended and superseded on denial of reh'g*, 519 F.3d 985 (9th Cir. 2008). While a convicted prisoner must show subjective deliberate indifference to establish a violation of the Eighth Amendment, the analysis differs for pretrial detainees seeking to establish that a denial of medical care violates the Fourteenth Amendment.

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cnty. Of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).

As detailed above, Plaintiffs are entitled to greater protection than both convicted prisoners and criminal pretrial detainees. *See Jones*, 393 F.3d at 934; *King*, 885 F.3d at 557. Accordingly, deprivations of medical care that violate the rights of convicted prisoners or criminal pretrial detainees *a fortiori* violate the rights of civil immigration detainees like Plaintiffs. *See Unknown Parties*, 2016 WL 8188563, at *4 ("Conditions of confinement that violate the Eighth Amendment necessarily violate the Fifth Amendment…").[41]

### 1.    Minimal Requirements of a Prison Health Care System.

In the prison context, the Ninth Circuit has set forth the elements of a minimally adequate health care system:

> The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care. Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff. Access to

---

[41] Because of the relative dearth of cases involving the health care rights of civil detainees, this brief relies primarily on cases involving criminal pretrial detainees and convicted prisoners.

the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can. … [T]he prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. These requirements apply to physical, dental and mental health.

*Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (citation omitted), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995); *see also Brown v. Plata*, 563 U.S. 493, 510-11 (2011) ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate care, is incompatible with the concept of human dignity and has no place in civilized society.").

"That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). In an injunctive case, the plaintiff need not show actual physical injury; rather, the Constitution is violated by an unreasonable *risk* of harm. *Id.* at 33, 34 (noting that it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *see also Brown*, 563 U.S. at 531-32 ("[A]ll prisoners in California are at risk so long as the State continues to provide inadequate care. . . . [P]risoners who are not sick or mentally ill . . . [are] in no sense [] remote bystanders in California's medical care system. They are that system's next potential victims.").

### 2.      Defendants' Failure to Provide Adequate Intake Health Screening Violates the Constitution.

Defendants' failure to conduct adequate physical and mental health screenings of detainees when they are admitted to FCI Victorville subjects detainees to an unnecessary risk of serious harm. It is well established that correctional institutions must conduct adequate medical and mental health screenings in order to identify individuals' health needs and risk factors. *Plata v. Schwarzenegger*, Case

No. C01-1351-TEH, 2005 WL 2932253, at *12 (N.D. Cal. 2005) ("An adequate intake exam should take fifteen to twenty minutes for a young healthy prisoner and thirty to forty minutes for prisoners with more complicated health problems."). By failing to do so, Defendants violate the Constitution. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1205 (N.D. Cal. 1995) (citing "grossly inadequate" intake physical health screenings); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 n.10 (E.D. Cal. 1995) (obligations include "a systematic program for screening and evaluating inmates to identify those in need of mental health care" and "a basic program to identify, treat, and supervise inmates at risk for suicide"). Defendants' failure to provide meaningful mental health screenings is particularly reckless in light of the fact that many ICE detainees are known to be fleeing traumatic and violent circumstances in their home countries. *See, e.g.*, Exhibit 4 (attached hereto) at ¶ 4 (detainee was locked up and tortured with electrical shocks in his home country); Doc. 1-6 at ¶¶ 11, 14 ("I got really depressed. [. . .] I began thinking about . . . the horrible things that had happened to us that caused us to come to the U.S.").

Defendants' failure to provide adequate medical and mental health screening reflects the shortage of health care professionals to meet the basic needs of detainees at FCI Victorville. Courts have held that prison facilities must have adequate staffing levels to deliver medical and mental health services to prisoners. *Plata,* 2005 WL 2932253, at *5-12; *Madrid,* 889 F.Supp. at 1257. Prison systems also must ensure that medical care is performed by qualified personnel. *Plata,* 2005 WL 2932253, at *5; *see also Casey* v. *Lewis,* 834 F.Supp. 1477, 1545 (D. Ariz. 1993).

Defendants' failure to provide adequate health screening to ICE detainees at FCI Victorville also violates BOP and ICE health care policies. *See* BOP PS 6031.04, 1, 23 (June 3, 2014) (initial screening "will be done within 14 days of admission"); BOP PS P6340.04 (Jan. 15, 2005); *see also* PBNDS 2011 §§ 4.3 II(14) (detainees "shall receive a comprehensive medical, dental and mental health intake

screening as soon as possible, but no later than 12 hours after arrival at each detention facility"); II(15) (requiring "comprehensive health assessment, including a physical examination and mental health screening, by a qualified, licensed health care professional no later than 14 days after entering into ICE custody or arrival at facility"); *id.* at §§ 4.3 V(A)(1), (J) (requiring communicable disease screening).

### 3. Defendants' Failure to Provide Access to Emergency and Routine Health Care Violates the Constitution.

Defendants' failure to provide a functional system to respond to the routine and emergent health care needs of ICE detainees in their custody violates their due process rights. *See Hoptowit*, 682 F.2d at 1253; *Madrid*, 889 F. Supp. at 1257. As set forth above, ICE detainees at Victorville report that Defendants do not respond to their requests for urgent medical attention, and even instruct them not to press the emergency call buttons in their cells unless they are "dying." Doc. 1-11 at ¶¶ 7-8.

Nor do defendants provide a reliable system for detainees to access routine health care. Detention facilities must "provide a system of ready access to adequate medical care," *Hoptowit*, 682 F.2d at 1253. Such a system must obviously include a means for detainees "to make their medical problems known to the medical staff." *Id.* At FCI Victorville, however, Plaintiffs report being unable to access medical attention, even when they are in significant pain and distress.

These failures are compounded by Defendants' denial of consistent language interpretation services during medical encounters for detainees who do not speak English. *See Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1316-17 (9th Cir. 1995), *opinion amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995) (affirming injunction requiring provision of non-detainee translators for medical encounters). Defendants' inappropriate reliance on other detainees to serve as translators, including for sensitive medical encounters, violates the Constitution as well as state and federal health privacy laws and ICE's own detention standards. *See id.*, 45 F.3d at 1317 ("The testimony was undisputed that inmate translation was inappropriate

and potentially inaccurate"); *see also* PBNDS 2011 § 4.3 III (25) ("Medical and mental health interviews, screenings, appraisals, examinations, procedures and administration of medication shall be conducted in settings that respect detainees' privacy"); *id.* § V(E) ("Where appropriate staff interpretation is not available, facilities will make use of professional interpretation services. Detainees shall not be used for interpretation services during any medical or mental health service.").

### 4. Defendants' Failure to Provide Adequate Mental Health Care Violates the Constitution

In a detention setting, "the requirements for mental health care are the same as those for physical health care needs." *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994). The Constitution requires Defendants to provide "a treatment program that involves more than segregation and close supervision of mentally ill inmates" and "employ[] … a sufficient number of trained mental health professionals." *Coleman*, 912 F. Supp. at 1298 n.10; *see also Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984) (adequate "treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders") (citation omitted). Defendants' failure to provide meaningful assessment or treatment of Plaintiffs' mental health needs violates their constitutional rights.

The failure to provide adequate mental health care also violates ICE and BOP standards. *See* PBNDS 2011 § 4.3 N(3) (requiring referral when detainee is exhibiting symptoms of serious mental health issues); BOP PS 5310.16 (May 1, 2014) (BOP should "ensure that inmates with mental illness are identified and receive treatment").

### 5. Defendants' Failure to Provide Adequate Medication Violates the Constitution.

Defendants' failure to provide necessary medications to ICE detainees at FCI

Victorville also violates the Constitution. *See Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011) (failure to provide prescribed medication); *Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (abrupt and unsupported discontinuation of medications could support finding of Constitutional violation). In addition, medication regimes must be supervised by qualified health care staff. *See Gates v. Cook,* 376 F.3d 323, 342-43 (5th Cir. 2004) (monitoring and assessment of psychotropic medication levels required); *Wellman v. Faulkner,* 715 F.2d 269, 272-73 (7th Cir. 1983) (psychiatrist must supervise psychotropic medication); *Coleman,* 912 F. Supp. at 1309-10 (finding constitutional violation when "defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring").

### 6. Custody Staff Violate the Constitution by Using Threats and Retaliation to Improperly Interfere with Health Care.

Custody staff violate the Constitution when they "intentionally deny[] or delay[] access to medical care or intentionally interfer[e] with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *see also Plata*, 2005 WL 2932253, at *15 ("custody staff present a determined and persistent impediment" and have "a common lack of respect" for medical staff); *Madrid*, 889 F. Supp. at 1257-58 (prison officials may not prevent treatment that is medically necessary in the judgment of the treating doctor); *Casey*, 834 F. Supp. at 1545 (same). By retaliating against Plaintiffs for requesting medical care and demanding that they do not request medical assistance, custody officers at FCI Victorville have obstructed Plaintiffs' access to such care, in violation of the Constitution.

### C.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR RFRA CLAIM.

Under the Religious Freedom Restoration Act ("RFRA"), the government may substantially burden a person's sincere exercise of religious beliefs *only if* the government can demonstrate that the challenged conduct is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000bb-1(b). RFRA applies this strict scrutiny standard to "all Federal law, and the implementation of that law, whether statutory or otherwise," and it protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7).

At FCI Victorville, civil immigrant detainees of faith are unable to attend religious services or engage in other congregate worship and are limited in their ability to participate in group prayer and religious study. They have no access to religious counseling and consultation with clergy or a spiritual adviser. And they are restricted in obtaining and possessing religious headwear, jewelry, texts, and other religiously significant items. Subjecting detainees to FCI Victorville's restrictions, which prevent them from exercising their religious beliefs, violates RFRA.[42]

#### 1.   FCI Victorville's Limitations on Religious Expression and Practices Substantially Burden Detainees' Religious Exercise.

"[G]overnment action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs." *Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015) (forcing Muslim prisoner to

---

[42] RFRA provides "greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015). Thus, Plaintiffs need only establish a likelihood of success on their RFRA claim. *See Harbor Missionary Church Corp. v. City of San Buenaventura*, 642 F. App'x 726, 728 (9th Cir. 2016). However, Plaintiffs are likely to succeed under the First Amendment as well because each of the four free-exercise factors considered by the Ninth Circuit in *Pierce*, 526 F.3d at 1209, weigh in Plaintiffs' favor.

cook pork substantially burdened his religious exercise).[43] This coercion can take various forms, including "an outright ban on a particular religious exercise," *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008), indirect pressure that leads to a change in religious practice, *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005), and the imposition of "alternatives [that] require substantial delay, uncertainty, and expense," *Nance v. Miser*, 700 F. App'x 629, 632 (9th Cir. 2017) (internal quotation marks omitted). Defendants' limitations on detainees' ability to exercise their sincerely held religious beliefs are the very sort of restrictions recognized by courts as substantially burdening people of faith.

First, group worship is a core religious practice. *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("[T]he 'exercise of religion' often involves . . . physical acts [such as] assembling with others for a worship service[.]"). Accordingly, the Ninth Circuit has held that barring prisoners from participation in group worship, prayer, or religious study substantially burdens the exercise of their religion. *See, e.g.*, *Greene*, 513 F.3d at 988. Yet, despite their own policies providing for group worship and prayer, *see supra* II.A., Defendants have denied detainees the ability to exercise their faith in a congregate manner. They prohibit detainees from attending whatever religious worship services may be provided to the inmate population; they refuse to provide separate worship services for detainees; and they have restricted efforts to gather informally for group prayer and worship. *See supra* II.D.

Second, detainees have no access to clergy or religious counseling. *See supra* II.D. Instead, Defendants have left detainees to fend for themselves spiritually at a time when many of them desperately need religious guidance and comfort. This also substantially burdens detainees' religious exercise. *See, e.g.*, *Merrick v. Inmate*

---

[43] RFRA and its sister statute, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq*., apply identical legal standards. *Holt*, 135 S. Ct. at 860. Plaintiffs treat as interchangeable cases applying either statute.

*Legal Servs.*, 650 F. App'x 333, 335-36 (9th Cir. 2016) (plaintiff adequately pleaded that "not allowing him to confess to clergy of his faith by way of unmonitored, unrecorded phone calls substantially burdened his religious exercise"); *Pierce*, 526 F.3d at 1210 (upholding injunction where evidence did not support defendant's contention that it provides "opportunities for inmates to participate in religious services and counseling").

Finally, Defendants personal religious items, including religious texts, headwear, and jewelry, are routinely confiscated by the government. *See supra* II.D. Defendants refuse to return these items to detainees or provide adequate replacements. *Id.* Depriving detainees of access to religious texts results in a substantial burden on their religious exercise. *See, e.g.*, *Harris v. Escamilla*, No. 17-15230, 2018 WL 2355123, at *1 (9th Cir. May 24, 2018) (officer's desecration of prisoner's Quran, so that prisoner was unable to read his required ten daily verses, was a substantial burden on prisoner's religious exercise); *cf. Sutton v. Rasheed*, 323 F.3d 236, 257 (3d Cir. 2003) (noting that a Christian "could [not] practice his faith," if "deprived of a Bible"). So too does Defendants' interference with detainees' ability to wear religious headgear and jewelry.[44] Defendants have purported to make turbans available for purchase via the commissary. *See supra* II.D. However, detainees still face substantial delays and hurdles in obtaining them and suffer shame and spiritual harm in the meantime. Many detainees, moreover, cannot afford to purchase turbans from the commissary, no matter the cost.

_____

[44] *See, e.g.*, *Ortiz v. Downey*, 561 F.3d 664, 669-70 (7th Cir. 2009) (prisoner adequately stated claim showing substantial burden under RLUIPA where he alleged denial of access to rosary and prayer booklet); *Singh v. Goord*, 520 F.Supp.2d 487, 503 (S.D.N.Y. 2007) (prohibiting Sikh prisoner from wearing his turban during outside transports and limiting wear of kara to 30 minutes per day substantially burdened his exercise of religious beliefs that required him to wear both at all times).

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES

### 2. FCI Victorville's Religious-Exercise Restrictions Are Not the Least Restrictive Means Available to Defendants.

Because FCI Victorville's restrictions on detainees' religious practices substantially burden their exercise of sincerely held religious beliefs, the burden shifts to Defendants to prove that subjecting Plaintiffs to these policies is the least restrictive means of achieving a compelling governmental interest. *See Gartrell v. Ashcroft*, 191 F. Supp. 2d 23, 38 (D.D.C. 2002). Defendants' burden under RFRA is heavy; courts may not give "unquestioning deference" to government officials. *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015). In particular, "the least-restrictive-means standard is exceptionally demanding, and it requires the government to sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Id.* (internal citation and quotation marks omitted). Where a less restrictive means "is available for the Government to achieve its goals, the Government must use it." *Id.* (internal quotation marks omitted).

Here, even if Defendants could identify a compelling interest that is furthered by their limitations on detainees' religious exercise, which they cannot, Defendants' own policies make clear that FCI Victorville's practices are not the least restrictive means available to Defendants. Indeed, FCI Victorville, the BOP, and ICE all have policies that explicitly allow prisoners to engage in the religious practices Defendants have obstructed here. Those policies constitute strong evidence that Defendants' religious-practice restrictions violate RFRA.

The BOP's Religious Beliefs and Practices Program Statement, for example, provides that (i) "[a]uthorized congregate services will be made available for all inmates weekly"; (ii) religious headwear allowed "throughout the institution" includes, among other items, yarmulkes, Kufis, and turbans; (iii) religious texts, magazines, and periodicals are permitted in accordance with the general rules pertaining to personal property; and (iv) "[i]f requested by an inmate, the chaplain

shall facilitate arrangement for pastoral visits by a clergy person or representative of the inmate's faith."[45]

FCI Victorville's Inmate Handbook likewise touts the availability of religious headwear, religious medallions and specialty items, religious literature, and pastoral care and counseling. *See* FCC Victorville Inmate Handbook (2015) 25-28, https://www.bop.gov/locations/institutions/she/SHE_fdc_aohandbook.pdf. The Handbook further states that the prison "provides a variety of worship services, study groups, and prayer/meditation meetings each week," as well as "special activities such as seminars, liturgical meals, fasting periods, holidays, and other events. *Id.* at 26. Purportedly, "[a]ll residents are welcome to attend any religious programs without regard to their religion of record." *Id.* The welcoming picture painted by the prison's Inmate Handbook stands in stark contrast to the reality of detainees' day-to-day lives.

These BOP and FCI Victorville policies set forth less restrictive means that Defendants easily could employ here. *See, e.g.*, *Ware v. La. Dep't of Corr.*, 866 F.3d 263, 269 (5th Cir. 2017) ("[I]n the face of evidence of contrary policies, we may not defer to prison officials' mere say-so that they could not accommodate [the plaintiff's] request because these other policies indicate that a less restrictive means may be available.") (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 1181 (2018).

Even less restrictive than the BOP's religion policies are ICE's Detention Standards. *See* PBNDS 2011 § 5.5 at 375 ("Detainees shall have regular opportunities to participate in practices of their religious faiths, limited only by a documented threat to the safety of persons involved in such activity itself or disruption of order in the facility."). The ICE standards are—in several important

---

[45] BOP PS P5360.09, at 1, 3-4, 9, 11-15, 16 (Dec. 31, 2004).

ways—more solicitous of religious practice than the BOP and Victorville policies.

For instance, in recognition of the many different countries and cultures from which ICE detainees hail, the ICE detention standards affirmatively require officials to ensure that non-English speakers are able to benefit from religious programs.[46] Yet those standards have not been implemented at FCI Victorville.[47] In addition, although the BOP and ICE authorize the same type of head coverings to be worn, ICE policy expressly mandates that "[r]eligious headwear and other religious property shall be handled with respect at all times, including during the in-take process." PBNDS 2011 § 5.5 at 375. ICE detention standards also generally allow detainees to retain their personal religious headwear if it meets the facility's standards; where "the detainee's personal religious headwear does not conform to the standard, the facility *must ensure* that detainees are provided conforming religious headwear for free or at a de minimums [sic] cost." *Id*. (emphasis added). And ICE detention standards provide that the chaplain "will make documented efforts to recruit external clergy or religious service providers to provide services to adherents of faith traditions not directly represented" by chaplaincy staff—an affirmative obligation not imposed under BOP policy. *Id*.

The ICE standards thus represent yet another, less restrictive alternative available to Defendants. *See Holt*, 135 S. Ct. at 866 ("'While not necessarily

---

[46] *See, e.g*., PBNDS 2011, at 376 ("Language services *shall* be provided to detainees who have limited English proficiency to provide them *with meaningful access to religious activities*.") (emphasis added). *See also id*. at 375-78.

[47] BOP policy is markedly less accommodating to the language needs of the detainee Subclass. Unless the warden authorizes otherwise, "[s]ermons, original oratory teachings and admonitions must be delivered in English." BOP PS P5360.09, at 1, 3-4 (Dec. 31, 2004). Moreover, most detainees are not provided any information in their native languages, including information about religious programming and religious accommodations. *See, e.g*., Doc. 1-18 at ¶5; Doc. 1-7 at ¶ 4.

controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction.'") (quoting *Procunier v. Martinez*, 416 U.S. 396, 414, n.14 (1974)); *Warsoldier*, 418 F.3d at 1000 ("[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means."). At a minimum, then, the Court should order Defendants to apply ICE's own detention standards to ICE detainees at FCI Victorville.

Finally, nothing requires Defendants to detain immigrants at FCI Victorville. Victorville officials already have demonstrated that they have no compunction about denying detainees the ability to engage in basic religious practices, even when doing so violates BOP (and their own) policies. Ending placement of detainees at Victorville is yet another less restrictive means available to Defendants, which would ensure that no detainee is ever again subjected to the prison's untenable restrictions on religious exercise. *See Gartrell,* 191 F. Supp. 2d at 39-40 (holding that BOP's placement of federal prisoners at Virginia state prisons, where they could not grow religiously mandated beards, was not the least restrictive means).

### D.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH IN PLAINTIFFS' FAVOR.

The remaining equitable factors in the preliminary injunction analysis weigh heavily in Plaintiffs' favor. First, detainees suffer irreparable harm each day as a result of the degrading and dangerous conditions of confinement at FCI Victorville. As the Ninth Circuit recently held, "subpar medical and psychiatric care in ICE detention facilities" constitute "irreparable harms imposed on anyone subject to immigration detention." *Hernandez*, 872 F.3d at 994-95 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)) (holding constitutional violations sufficient to show irreparable injury, but describing harms "in more concrete terms"). Moreover, "the deprivation of constitutional rights 'unquestionably

1  constitutes irreparable injury.'" *Melendres*, 695 F.3d at 1002 (citation omitted),

2  because these violations "cannot be adequately remedied through damages," *Am.*

3  *Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1059 (9th Cir. 2009) (internal

4  quotation and citation omitted). [48]

5      Second, enjoining unconstitutional conditions of confinement at FCI

6  Victorville, and violations of detainees' religious-exercise rights is squarely in the

7  public interest. Indeed, "'it is always in the public interest to prevent the violation of

8  a party's constitutional rights.'" *Melendres*, 695 F.3d at 1002 (quoting *Sammartano*

9  *v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)).

10      Finally, the balance of hardship tips heavily in Plaintiffs' favor. Under this

11  prong of the preliminary injunction analysis, courts "must balance the competing

12  claims of injury and must consider the effect on each party of the granting or

13  withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation

14  marks omitted). The Ninth Circuit has held that the interest in protecting individuals

15  from physical harm outweighs monetary costs to government entities. *See Harris v.*

16  *Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("[F]aced with[ ] a

17  conflict between financial concerns and preventable human suffering, [the court has]

18  little difficulty concluding that the balance of hardships tips decidedly in plaintiffs'

19  favor.") (internal quotations omitted). Likewise, the Ninth Circuit has recognized

20  that, where "plaintiffs have 'raise[d] serious First Amendment questions,'" it

21  "'compels a finding that ... the balance of hardships tips sharply in [their] favor.'"

22  *Davies v. Los Angeles Cnty. Bd. of Supervisors*, 177 F. Supp. 3d 1194, 1227 (C.D.

23  Cal. 2016) (quoting *Sammartano*, 303 F.3d at 973).

24      Here, ICE detainees at FCI Victorville suffer serious risks from Defendants'

25

26  [48] Defendants' violation of detainees' RFRA rights also constitutes irreparable harm.

27  *See, e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF
POINTS AND AUTHORITIES

1 | inadequate health care practices and the excessively punitive conditions to which
2 | Defendants subject them. They also suffer the deprivation of one of our most
3 | cherished rights—the right to freely practice one's faith. By contrast, the
4 | "government suffers no harm from an injunction that merely ends unconstitutional
5 | practices and/or ensures that constitutional standards are implemented." *Doe*, 878
6 | F.3d at 718 (upholding preliminary injunction requiring constitutionally adequate
7 | conditions in ICE temporary detention facilities in Arizona) (citation omitted). [49]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue the Proposed Order for Preliminary Injunction, filed herewith.

_____

[49] Plaintiffs seek a waiver of the security requirement for preliminary injunctions. Fed. R. Civ. P. 65(c). Security "is not required where plaintiffs are indigent or where considerations of public policy make waiver of a bond appropriate." *Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal. 1991). Plaintiffs are immigrants, challenging their conditions of confinement, detained without income, and far from their families and community resources. *See, Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1165 (D. Or. 2018) ("any security in this case would be unjust").

5:18-CV-01609

DATED: September 11, 2018          Respectfully submitted,

                                    By:   /s/ Margot Mendelson

**ACLU FOUNDATION**                 **PRISON LAW OFFICE**
David C. Fathi                      Don Specter
Daniel Mach                        Corene Kendrick
Victoria Lopez                     Margot Mendelson
Heather L. Weaver                  **Attorneys for Plaintffs**

**CIVIL RIGHTS EDUCATION AND**     **MEYERS, NAVE, RIBACK, SILVER &**
**ENFORCEMENT CENTER**             **WILSON**
Timothy Fox                        Nancy E. Harris
Elizabeth Jordan                   Jason S. Rosenberg
                                    Ellyn L. Moscowitz
                                    Anne E. Smiddy

40                                 5:18-CV-01609